GIBSON, DUNN & CRUTCHER LLP
MAURICE SUH, SBN 147485
  msuh@gibsondunn.com
JEREMY S. SMITH, SBN 283812
  jssmith@gibsondunn.com
ANDREW M. KASABIAN, SBN 313210
  akasabian@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

BELL, MCANDREWS & HILTACHK LLP
THOMAS W. HILTACHK, SBN 131215
  tomh@bmhlaw.com
BRIAN T. HILDRETH, SBN 214131
  bhildreth@bmhlaw.com
PAUL T. GOUGH, SBN 75502
  pgough@bmhlaw.com
455 Capitol Mall, Suite 600
Sacramento, CA 95814
Telephone: 916.442.7757
Facsimile: 916.442.7759

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARLOW RESPIRATORY HOSPITAL; PIH HEALTH GOOD SAMARITAN HOSPITAL; PROVIDENCE HOLY CROSS MEDICAL CENTER; HOSPITAL ASSOCIATION OF SOUTHERN CALIFORNIA, an Incorporated California Nonprofit Membership Association; CALIFORNIA HOSPITAL ASSOCIATION, an Incorporated California Nonprofit Membership Association, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES; OFFICE OF WAGE STANDARDS FOR THE CITY OF LOS ANGELES; ERIC GARCETTI, in his official capacity as Mayor of Los Angeles; and DOES 1-20, <br><br> Defendants. | CASE NO. <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Gibson, Dunn &
Crutcher LLP

1.      The City of Los Angeles Ordinance No. 187566 is the City's first attempt to impose a targeted wage requirement on one of the most complex industries in the United States—the delivery of healthcare.  Unfortunately, perhaps because it rushed to convert an initiative into an ordinance without any legislative analysis or research, the City has done so in violation of the United States and California Constitutions by drawing distinctions between similarly situated groups of workers and employers that serve no purpose—or are outright inimical—to the stated goal of combatting labor shortages and increasing workforce retention.

2.      In contrast with other minimum wage laws that address a particular industry, the Ordinance hits only certain healthcare facilities with a sudden, sharp increase in labor costs, even though these facilities rely on fixed government and insurer reimbursement systems.  In this way, the Ordinance functions like a bull in a china shop.  It tramples its own stated goals, harms the covered healthcare facilities, worsens workforce retention, and creates labor market instability.

3.      That is because under the Ordinance, nearly all workers—from nurses to janitors to kitchen staff—at private hospitals, clinics associated with such hospitals, and dialysis clinics will be entitled to a minimum wage of $25 an hour—a 55% increase in the minimum wage.  But workers with the exact same job, possibly just down the street or a few blocks away, at facilities ranging from for-profit healthcare clinics other than a dialysis clinic, community health clinics, federally qualified healthcare clinics, public hospitals, ambulatory surgery centers, or family planning clinics will not be entitled to a minimum wage of $25.  There is no rhyme or reason for why this Ordinance singles out *some*, *but not all*, healthcare facilities across the City and provides *some*, *but not all*, healthcare workers in the City a 55% raise in the minimum wage.

4.      The Ordinance's scattershot definition of which facilities are "covered" by the increased minimum wage requirement defeats, and thus bears no rational relationship to, the Ordinance's stated purposes of reducing healthcare staffing

shortages and workforce retention.  The Ordinance exacerbates the very problems it seeks to solve:  The facilities that are not covered by the Ordinance employ more than half of the City's healthcare workers and already suffer from higher rates of staffing shortages and workforce turnover.  By arbitrarily raising the minimum wage by 55% for only some workers in the same occupation, the Ordinance undercuts the ability of non-covered facilities—many of which serve the most vulnerable communities of Angelenos—to retain their workers.  Why work for $16 an hour at a family planning clinic, when you can get $25 an hour down the street at a dialysis clinic?  Because there is no "reasonably conceivable state of facts that could provide a rational basis for the classification" between covered and non-covered facilities, the Ordinance must fail.  *FCC v. Beach Commn'cs, Inc.*, 508 U.S. 307, 313 (1993).

5.     Furthermore, the Ordinance imposes this increase in labor cost at a time when hospitals and clinics in the Los Angeles area are reeling from the effect of the COVID-19 pandemic.  During the COVID-19 pandemic—the effects of which are expected to continue through at least the next year—hospitals, clinics, and other healthcare facilities have been placed under severe financial distress due to increased costs and staffing shortages.  This is true of both covered and non-covered healthcare facilities.  A number of healthcare facilities that are covered by the Ordinance are already on the brink of bankruptcy.

6.     The Ordinance also throws another potentially fatal wrench into the unique and extremely complex healthcare industry.  Unlike hotels, restaurants, or other service industries, healthcare industry revenue is almost entirely composed of government program monies and private insurance payors.  Hospitals and other healthcare providers do not have the flexibility to absorb increased wage costs because reimbursement rates (the primary driver of facilities' revenue) are set in contracts that take years to re-negotiate or change.  And labor costs are a substantial portion of healthcare facilities' expenses.  Therefore, healthcare facilities cannot easily increase revenue to account for the increased costs caused by the Ordinance, likely forcing

certain covered facilities to undergo reorganization (including laying off employees) or close operations entirely.  This, too, worsens the staffing shortage and retention issue in the worst way possible—by putting covered facilities out of business.

7.     The Ordinance not only unsettles the City's healthcare landscape during precarious times, but also requires covered facilities to meet an unconstitutional 31-day timetable to come into compliance with the 55% increase in the minimum wage. Thirty-one days is simply not enough time for even the nimblest healthcare provider to implement a 55% rise in the minimum wage, when (1) nearly all of its revenue is either set by the government in the form of Medicare, Medi-Cal, and grants, or based on contracts with private insurers that cannot be adjusted in days, and (2) the Ordinance is sufficiently vague regarding the employees covered that regulatory guidance from the City of Los Angeles will be required.  The Ordinance's unreasonable effective date to implement a vague program violates the adequate notice requirements embedded in the Due Process Clauses of the United States and California Constitutions.

8.     Nor does the Ordinance's illusory "one-year court-granted waiver" provision alleviate those harms in any way.  While the Ordinance itself recognizes that the enormous and immediate 55% increase in the minimum wage could cause healthcare providers to shut their doors and turn away their patients, the waiver procedure is nothing more than a false promise of temporary relief because it does not establish an expedited process to actually obtain the waiver.  Instead, the Ordinance offers only undefined court proceedings to prove that the new minimum wage interferes with the facility's ability to continue as a "going concern"—a notoriously complex accounting concept that requires data that could not possibly be gathered, analyzed, presented, and then litigated in court in time for a court ruling within 31 days.  The Ordinance's illusory waiver procedure only compounds (rather than salvages) the Ordinance's Due Process violations.

9.     In short, the Ordinance puts healthcare facilities' constitutional rights at risk.  It also jeopardizes the quality and availability of healthcare for City residents.

Gibson, Dunn &
Crutcher LLP

Plaintiffs therefore bring this action to prevent these devastating consequences before it is too late.  Only a temporary injunction, and ultimately a permanent injunction, can protect the citizens of Los Angeles who depend on the healthcare facilities located in the City and prevent the potential financial collapse of covered and non-covered facilities on the brink of closure that will be generated by this Ordinance.

**PARTIES**

10.     Plaintiff Barlow Respiratory Hospital ("Barlow") is a 105-bed, long-term acute care hospital that serves Los Angeles County and the surrounding regions.  It is a national leader in weaning chronically critically ill patients from mechanical ventilation.  Barlow is the only not-for-profit long-term care hospital in California.  It is the destination of choice for medically complex and chronically critically ill patients referred to Barlow from intensive or critical care units at the finest hospitals in California.  Its interdisciplinary teams include board-certified physicians, registered nurses, and licensed therapists.  With over 120 years of service, Barlow works to provide individualized care and treatment for each of its patients.  Barlow's goal is to achieve the best possible outcomes and to return its patients to their homes or to discharge them to lower levels of care.  Barlow's main campus is located in downtown Los Angeles (49 beds), with two satellite campuses in Whittier (26 beds and outside the City of Los Angeles) and Van Nuys (30 beds and inside the City of Los Angeles).  Over 70 hospitals refer patients to Barlow.  Approximately 80% of its patients rely on government payors for their care.  On information and belief, Barlow believes its facilities within the City of Los Angeles are "Covered Healthcare Facilities" under Ordinance § 187.51(B), while its similarly situated facility in Whittier would not be.  Since the beginning of the pandemic, Barlow has been facing severe financial hardship.  Being forced to comply with the Ordinance will not only place an economic hardship on Barlow, but Barlow may very well cease to exist.  Barlow's small operations also means that it does not have the staffing to quickly implement the

Gibson, Dunn &
Crutcher LLP

5

change to comply with the Ordinance or to quickly apply for, and obtain, a one-year exemption from the Ordinance.

11.     Plaintiff PIH Health Good Samaritan Hospital ("Good Samaritan") is a nonprofit, 408-bed acute care hospital.  Founded in 1885, it is the oldest hospital in Los Angeles.  Good Samaritan joined the PIH Health network in 2019 in order to save Good Samaritan from closing.  Good Samaritan is dedicated to putting patients first— which is a cornerstone of its mission, vision and values.  In its last fiscal year, Good Samaritan contributed nearly 16% of its annual expenses to charity care and other community benefit efforts, to a total of $71,373,964, serving 52,307 individuals.  Due to its location in downtown Los Angeles, Good Samaritan will continue to dedicate its resources to those Angelenos with the greatest need, including caring for a high number of patients on Medi-Cal.  On information and belief, Good Samaritan believes its facilities within the City of Los Angeles are "Covered Healthcare Facilities" under Ordinance § 187.51(B).

12.     Plaintiff Providence Holy Cross Medical Center ("Providence Holy Cross") is a 377-bed, not-for-profit facility founded in 1961 that offers a wide range of inpatient and outpatient health services, including a Level II Trauma Center, home health care, health education, and community outreach programs.  Providence Holy Cross is committed to providing compassionate, highly reliable, safe care.  Providence Holy Cross has received regional and national awards and designations relating to its quality of care, the quality of nursing staff, and its specialty services.  Approximately 50% of Providence Holy Cross's expenses are due to labor costs.  On information and belief, Providence Holy Cross believes that it will be a "Covered Healthcare Facility" under Ordinance § 187.51(B).

13.     Plaintiff Hospital Association of Southern California ("HASC") is a not-for-profit regional trade association that is dedicated to effectively advancing the interests of hospitals in Los Angeles County and elsewhere.  HASC and its member hospitals and health systems all operate with a common goal:  to improve the operating

1  environment for hospitals and the health status of the communities that they serve.

2  The interests that this suit seeks to protect are germane to HASC's purpose—namely,

3  to ensure that its members can continue to operate and to ensure that HASC's Los

4  Angeles-based members can continue to serve their communities.  Many of HASC's

5  member hospitals would be subject to the wage requirements of the Ordinance and

6  therefore would have standing to sue in their own right, and the relief requested does

7  not require each individual member's participation.  Although HASC members include

8  facilities that are not subject to the Ordinance, they are also negatively impacted by its

9  requirements due to the increased risk of staffing shortages that are likely to follow if

10  the Ordinance is not enjoined.

11        14.    Plaintiff California Hospital Association ("CHA") is an incorporated

12  nonprofit association that represents the interest of public and private hospitals,

13  including for-profit and nonprofit hospitals, in California.  CHA advocates for better,

14  more accessible healthcare for all Californians by ensuring that hospitals can continue

15  to provide exceptional care to patients and comprehensive health services to

16  communities.  The interests that this suit seeks to protect are germane to CHA's

17  purpose—namely, to ensure that its members can continue to provide accessible health

18  care and comprehensive health services to the residents of Los Angeles.  Many of its

19  member hospitals, and their hospital-affiliated clinics, would be subject to the wage

20  requirements of the Ordinance and therefore would have standing to sue in their own

21  right, and the relief requested does not require each individual member's participation.

22  Although CHA members include facilities that are not subject to the minimum wage

23  requirements in the Ordinance, they are negatively impacted by such a requirement due

24  to the increased risk of staffing shortages that are likely to follow if the Ordinance is

25  not enjoined.  More than a dozen hospitals and many more hospital-affiliated clinics

26  would be affected by the Ordinance.

27        15.    Defendant City of Los Angeles ("City") is a municipal corporation duly

28  organized and existing under the Constitution and laws of the State of California.

Gibson, Dunn &
Crutcher LLP

7

16.     Defendant Eric Garcetti is made a party to this action in his official capacity as the Mayor of Los Angeles in the State of California.  Garcetti is sued in his official capacity under *Ex parte Young* to enjoin the enforcement of the Ordinance.  *See Ex parte Young*, 209 U.S. 123, 152–54 (1908).  Garcetti signed the Ordinance on July 8, 2022.

17.     Defendant Office of Wage Standards for the City of Los Angeles is the municipal department within the City of Los Angeles that oversees, enforces, and provides guidance on the City's wage-and-hour ordinances.  *See* Ordinance §§ 187.51(D), 187.54.

18.     Defendant "Doe" is a placeholder designation for any unidentified City official who has the authority, or purports to have the authority, to enforce the Ordinance against Plaintiffs, in the event that additional officials must be included as defendants in this lawsuit in order to afford Plaintiffs complete relief.

## JURISDICTION AND VENUE

19.     This action arises under the United States Constitution, California Constitution, and 42 U.S.C. § 1983.  Accordingly, this Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

20.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 57.

21.     Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

22.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant City of Los Angeles is located within this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

23.     An actual controversy exists between the parties concerning the constitutionality and validity of the City's Ordinance.  A declaration that the Ordinance is invalid and an injunction against its enforcement would resolve the controversy.

24.     A permanent injunction enjoining Defendants from enforcing the Ordinance against Plaintiffs and their members would protect Plaintiffs' and their members' constitutional rights.

## FACTUAL ALLEGATIONS

### A.    The Enactment of the Ordinance

25.     The Ordinance originated as a local initiative sponsored by organized labor that qualified for the November 2022 ballot.

26.     After an initiative qualifies for the ballot, as here, the City Council has three options:  (1) adopt the Ordinance without alteration; (2) submit the proposed Ordinance to the voters in a special election; or (3) submit the proposed Ordinance to the voters in the next general election (November 8, 2022).  Despite the serious impact of a 55% increase in the minimum wage on the healthcare facilities covered by the Ordinance, the City Council did not seek a report on the impact of the Ordinance on the healthcare community.

27.     Instead, on June 10, 2022, the City Clerk recommended that the City Council submit the proposed Ordinance to the next General Election, scheduled for November 8, 2022.  *See* Holly L. Wolcott, *Certification of Sufficiency of an Ordinance Initiative Petition: Minimum Wage for Healthcare Employees Working at Healthcare Facilities*, City of Los Angeles (June 10, 2022), https://lacity.primegov.com/meeting/attachment/409834.pdf?name=Report%20from%20City%20Clerk%20dated%206-10-22.

28.     Significantly, between June 10 and the first date that the Ordinance was on the City Council's agenda, substantial feedback was submitted to the City.  The overwhelming majority of correspondence on the record argued that the Ordinance should be left to the voters and not adopted by the City Council.  *See* Exs. 2–5.

- Many of the letters remarked that the Ordinance sets "new, arbitrary pay requirements for *some* health care workers at private hospitals and health care facilities, while completely ***excluding* thousands of health**

**care workers doing the same jobs at public hospitals and clinics, community clinics, Planned Parenthood clinics, nursing homes, surgery centers, retail pharmacies, and other medical offices in the City of Los Angeles**." *See* Ex. 2.  This is particularly concerning given that a recent study found that "for the first time in recent history more than half of California's hospitals are operating in the red."  *Id.* (quoting *Analysis: California Hospitals Endured Significant Financial Strain in 2021*, Kaufman, Hall & Associates, LLC (Apr. 19, 2022), https://www.kaufmanhall.com/sites/default/files/2022-04/KH_CHA-2021-Financial-Analysis-Ebook.pdf).

- Another letter remarked that "[t]here are over two thousand health care facilities, clinics and other providers that are excluded," and that the Ordinance would be "harmful to the workers and patients in our most vulnerable communities."  Ex. 3.

- Another medical center remarked that such unequal pay measures "discriminate and unfairly exclude healthcare workers," which can "create a domino effect whereby medical centers . . . who are already struggling financially will be put under a significant financial pressure to retain sufficient qualified workforce[,] increasing operation costs."  Ex. 4.

- Yet another medical center, which had just been through bankruptcy multiple times and which claims to be the largest provider of inpatient psychiatric treatment in Los Angeles, asked what the City Council will do "for this [low-income] community when [it] ha[s] to scale back [its] services?"  Ex. 5.

29.  At the City Council's June 21, 2022 public hearing on the Ordinance, several individuals reaffirmed that the Ordinance should not be unilaterally adopted by the City Council, but should instead be placed on the November 8, 2022 ballot.  As one

individual put it, "[i]f the City Council passes this Ordinance, then [the City Council] will be picking winners and losers in the healthcare workforce," as the "[m]ajority of healthcare workers in the City are excluded from this benefit," which targets workers in roles such as "security and food service and maintenance."[1]  If the Ordinance were to pass, it would place "workforce strain [on] community and public healthcare providers that cannot compete with the private facilities."[2]  Others explained that the "very fragile community clinics and public health facilities" not covered under the Ordinance "will be faced with the daunting choice between increasing minimum salaries in order to compete for the very limited workforce or settl[ing] for less staffing and widening the wage gap."[3]

30.    Notwithstanding this opposition and without having ordered a report or studied the consequences of the Ordinance, the City Council decided to adopt the Ordinance on June 21, 2022, and gave it final approval on June 29, 2022.  The Mayor signed it on July 8, 2022, and the Ordinance was published on July 13, 2022.  It goes into effect on August 13, 2022.  *See* Los Angeles Charter art. I, § 252 ("An ordinance shall go into effect 31 days from its publication.").

**B.    The Terms of the Ordinance**

31.    The current local minimum wage in Los Angeles is $16.04.[4]

32.    The Ordinance imposes a minimum wage of $25 per hour—a 55% increase—for any "Healthcare Worker" employed at a "Covered Healthcare Facility." Los Angeles Municipal Code § 187.52(B)(1).[5]

---

[1] *See Regular City Council – 6/21/22*, YouTube.Com at 54:58–55:20 (June 21, 2022), https://www.youtube.com/watch?v=NyKEaI_vPS8.

[2] *See id.* at 54:40–55:48.

[3] *See, e.g.*, *id.* at 1:27:13–1:28:45.

[4] *See July 1, 2022 Minimum Wage Ordinance Wage Rate Increase*, Mayor Eric Garcetti (Feb 1, 2022), https://wagesla.lacity.org/sites/g/files/wph1941/files/2022-02/2022%20MWR%20Increase%20Notice.pdf.

[5] The Ordinance is attached as Exhibit 1.

33.     Moreover, beginning on January 1, 2024, the Ordinance's minimum wage for "Healthcare Workers" at "Covered Health Facilities" is subject to annual increases based on cost-of-living measurements by the Consumer Price Index for Urban Wage Earners and Clerical Workers for the Los Angeles metropolitan area.  The Office of Wage Standards publishes the adjusted rates each year.  *Id.* § 187.52(B)(2).

34.     The increased minimum wage applies only to "Covered Healthcare Facilities" as defined by the Ordinance.  "Covered Healthcare Facility" is defined as certain "privately owned" facilities "located within the boundaries of the City," including licensed general acute care hospitals, outpatient clinics part of a general acute care hospital, skilled nursing facilities, chronic dialysis clinics, acute psychiatric hospitals and outpatient clinics and residential care facilities for the elderly associated with acute psychiatric hospitals, and integrated health care delivery systems.  *See id.* § 187.51(B).  In other words, Covered Healthcare Facilities are a subset of private hospitals, including clinics associated with such hospitals, acute psychiatric hospitals, and dialysis clinics.  On its own terms, the Ordinance does not apply to other similarly situated healthcare facilities—such as employees working for or at any community health clinic, a federally qualified healthcare clinic, an ambulatory surgery center, or a family planning clinic.

35.     Moreover, the Ordinance does not even apply to all employees at all Covered Healthcare Facilities.  Rather, the Ordinance defines Healthcare Worker (an employee entitled to at least $25 per hour) as "an Employee who is employed to work at or by a Covered Healthcare Facility to provide patient care, healthcare services, or services supporting the provision of healthcare."  This term includes "a clinician, professional, non-professional, nurse, certified nursing assistant, aide, technician, maintenance worker, janitorial or housekeeping staff person, groundskeeper, guard, food service worker, laundry worker, pharmacist, nonmanagerial administrative worker and business office clerical worker, but does not include a manager or supervisor."  *Id.* § 187.51(G).  It is unclear who is covered as a "non-professional" or

"aide." For instance, it is unclear whether a receptionist, a telephone operator, or information technology staff member is covered.

36. The Ordinance does allow covered facilities to seek a court-approved one-year waiver from the wage increase, but only if the covered facility can demonstrate "by substantial evidence" that compliance with the Ordinance would "raise substantial doubt" about a covered facility's "ability to continue as a going concern." *Id.* § 187.57. In order to do so, a covered facility must submit documentation regarding its financial condition, as well as evidence of "the actual or potential direct financial impact of compliance with" the Ordinance. *Id.*

37. The Ordinance authorizes substantial penalties in public and private enforcement actions against Plaintiffs. *See id.* § 187.54 (citing Los Angeles Municipal Code §§ 188.05–.11). And the penalties can multiple quickly, with penalties ranging from upwards of $50 to $120 *per employee per day* of a violation. *See* Los Angeles Municipal Code §§ 188.07(B), 188.08(A).

**C.** **The Alleged Basis for the Ordinance**

38. Despite applying to only *some* healthcare facilities within the City of Los Angeles—and again, only *some* employees within the group of covered employers—the Ordinance's stated "purposes" are to prevent workforce shortages and retention issues related to COVID-19 across the *entire* healthcare industry in Los Angeles based on two national surveys not specific to Los Angeles. The findings and purposes of the Ordinance broadly allege:

   a. "Hospitals, health systems, and clinics are facing staffing shortages that could jeopardize the availability of care in Los Angeles, especially in our most vulnerable communities."

   b. "Healthcare workers are on the front lines, dealing with the emotional, mental, and physical fallout of providing healthcare during a pandemic."

c.     "[T]he healthcare industry is competing with other economic sectors to fill critical non-clinical positions."

d.     "With rising housing costs, healthcare workers are being forced to live further from their places of work, increasing their stress in already stressful times."

e.     "Raising the minimum wage can help stabilize the incomes of healthcare workers who are low-wage earners" and "will help address the burnout, retention challenges, and worker shortages affecting healthcare workers in Los Angeles."

*Id.* § 187.50.

## D.     The Ordinance Will Damage Plaintiffs, the Healthcare Industry, and the Residents of Los Angeles

39.     The Ordinance's chosen means are a complete mismatch with its stated purposes and announced goals.  The Ordinance makes arbitrary distinctions about what facilities are subject to the increased $25 minimum wage, thereby exacerbating the very issues that it seeks to remedy:  It will not only undermine non-covered facilities already grappling with staffing shortages and retention problems but will exacerbate the financial pressures already faced by many covered facilities.  Moreover, the Ordinance does not provide Plaintiffs and other healthcare facilities with sufficient notice (31 days) in order to comply with the Ordinance or obtain a judicial waiver of the increased minimum wage obligation.  As a result, enforcement of the Ordinance infringes upon Plaintiffs' constitutional rights, threatens the entire healthcare industry, and harms the residents of Los Angeles.

### i.     The Ordinance Draws Arbitrary Lines over Its Coverage.

40.     The Ordinance draws irrational lines between who is covered and not covered.  The Ordinance draws a distinction between hospitals and draws further distinctions among clinics.  For example, clinics affiliated with private hospitals are covered but those clinics not affiliated with any hospital are not covered, except for

dialysis clinics, which are covered.  No legitimate purpose justifies this crazy-quilt classification test.

41.    The Ordinance's purposes do not justify why a receptionist at a standalone clinic is not covered by the Ordinance, but a receptionist at Providence Holy Cross's trauma center is covered.  Both types of facilities provide necessary healthcare services, both have been combatting the effects of the COVID pandemic, both are located within the City of Los Angeles, and both serve some of the neediest communities within the City.  Nor do the Ordinance's purposes justify why it would not cover Planned Parenthood facilities, but it would cover Plaintiff Barlow—a long-term acute care hospital that is a national leader in weaning chronically critically ill patients from mechanical ventilation.  And the Ordinance's purposes do not justify why a for-profit cosmetic surgery center performing nose jobs or a dermatology clinic that could be found on an episode of *Extreme Makeover* would not be covered by the Ordinance but a clinic associated with Cedars-Sinai treating severe birth defects is covered by the Ordinance.

42.    As another example, the Ordinance's purposes do nothing to explain why an employee in a dialysis clinic must be paid at least $25 per hour, while an employee in a Planned Parenthood facility does not.  But the Ordinance still singles out dialysis clinics for different treatment as compared to other clinics not affiliated with private hospitals for reasons that appear to be completely unrelated to the "purposes" of the Ordinance.[6]

43.    This renders the classification nonsensical even for rational basis review.  These baseless distinctions exist across covered and non-covered facilities.  The City

---

[6] Victoria Colliver, *Inside a California Health Care Union's Obsession with Kidney Dialysis Initiatives*, Politico (Nov. 19, 2021), https://www.politico.com/states/california/story/2021/11/19/inside-a-california-health-care-unions-obsession-with-kidney-dialysis-initiatives-1394715; Lauren Rosenhall, *Good Policy or Ballot Blackmail? Union Keeps Taking Its Fights with Health Industry to Voters*, Cal Matters (Oct. 20, 2020), https://calmatters.org/politics/california-election-2020/2020/10/california-healthcare-union-proposition-23/.

has presented no rational basis for treating differently two employees who do the exact same job, one at a covered facility and another at a non-covered facility.

44.     Plaintiffs acknowledge that some locally imposed, targeted minimum wage ordinances have been upheld on the basis that the regulated employers (such as hotels near airports) received public benefits (such as increased investments or use of government property) in exchange for the increase in minimum wage.  In short, the government in such a case chose to condition access to government benefits on increased wages.  But nothing of the sort occurs here.  Covered Healthcare Facilities do not use City property or receive special City benefits in exchange for this disparate treatment relative to non-covered facilities.

**ii.     The Ordinance Undermines Its Own Goals.**

45.     The arbitrary nature of the classifications in the Ordinance is further demonstrated by the fact that the Ordinance undermines its stated goals with respect to both covered and non-covered facilities.

46.     The Ordinance will strike a fatal blow to its goal of workplace stability as applied to covered facilities—many operating deep in the red—that will not be able to keep their doors open.  Indeed, approximately one-third of all healthcare facilities in Los Angeles are already operating in the red.  Nothing could be more counterproductive to increasing workforce stability than battering already struggling facilities with new, unexpected costs that they cannot adjust their revenue stream to cover.  Given that labor costs often constitute at or above 50% of a healthcare facility's expenses, a forced increase in minimum wages can have a devastating impact on overall expenses and a facility's bottom line.

47.     Nor will the Ordinance remedy any staffing shortages in the healthcare industry.  Many non-covered facilities cannot compete with the increased pay mandated for covered facilities.  Non-covered facilities—which already have a substantially greater proportion of workers earning less than $25 per hour *and* are already suffering from greater workforce turnover—will be at risk of losing *more* of

their staff, as more workers try to work for the covered facilities.  Therefore, non-covered facilities will either be forced to increase their wages, undermining the number of staff members that they can hire, or have greater staffing shortages as workers begin to leave.  Both choices will result in reduced care for Angelenos at non-covered facilities.  And for non-covered facilities that are already on the verge of having to close down, matching wages is not an option.

48.     Furthermore, the Ordinance's wage increase impacts covered facilities beyond the increased wages for covered employees currently making less than $25 per hour.  Increasing the wages of those workers will have a ripple effect throughout the workforce, putting covered facilities under substantial labor market pressure to increase wages throughout their organizations.  For example, if covered facilities must increase the hourly wage of a janitor to $25 per hour, an employee with higher qualifications who is currently making $35 per hour will expect a corresponding increase in pay.  This demand for wage increases the pressure on workforce retention, potentially creating further dislocation for covered employers who do not increase wages and exacerbating the financial pressure on facilities that are already in financial distress but are nonetheless forced to increase wages across the board.  The resulting staffing shortage and increased costs will reduce the quality of patient care in Los Angeles, as facilities will be forced to choose between increasing wages for the employees above the minimum wage workers (putting facilities further in the red and forcing them to choose what services to cut) or losing those workers (resulting in either less experienced healthcare professionals or a reduction in services due to reduced staffing).  Therefore, this is ultimately inimical to workforce retention, workplace continuity, and patient care.

49.     Barlow serves as the case in point.  If Barlow goes out of business, patients who rely on Barlow will likely struggle to obtain care elsewhere because of Barlow's specialized care.  Further, this would have a ripple effect on other facilities: other hospitals that currently transfer their ICU patients to Barlow for long-term care

will no long have that option and may have to retain these patients, limiting their bed availability for incoming patients requiring ICU care.  And even if Barlow could withstand the increased labor costs resulting from the Ordinance, Barlow would need to either reduce its services or cut costs through other methods.  For covered facilities, the increased minimum wage will not resolve the problem of staffing turnover because safety concerns and pressures associated with the COVID-19 pandemic have already caused high turnover among workers regardless of compensation level.  In the end, patients will suffer.

50.     Even without staffing shortages, increased wages will harm Angelenos. Covered facilities that must increase wages will be forced to try and cut costs through other means if they are operating on thin margins or at risk of closure.  This could include curtailing or eliminating community health programs, such as mobile screening centers and health education.

51.     The Ordinance also counterproductively increases turnover at non-covered facilities.  Non-covered facilities account for the majority of healthcare facilities in Los Angeles, and the Ordinance therefore benefits fewer than half of healthcare workers within City limits.  As a result, the challenges of retaining the majority of healthcare workers will worsen, not improve.  Because many of the non-covered facilities are the very facilities that serve "vulnerable communities," an increase in wages in covered facilities will result in worse care for the very communities that the Ordinance purports to protect.  Many non-covered facilities forecast that the Ordinance will increase turnover among their employees, as they leave to pursue jobs at covered facilities.

### iii.     The Ordinance's Notice Is Inadequate and Unconstitutional.

52.     The Ordinance fails to provide adequate notice to covered facilities in two ways.

53.     First, the publication of the Ordinance set off a 31-day countdown for covered facilities to comply with the Ordinance.  Unlike non-covered facilities, which

have the ability to choose when and to what extent, if at all, they would like to increase their wages,[7] no such choice exists for covered facilities. By August 13, 2022, all potentially covered facilities must: (1) determine which of its facilities are located within City limits; (2) determine whether they fall within the definition of a "Covered Healthcare Facility"; (3) determine which employees fall within the definition of a "Healthcare Worker"; (4) determine which Healthcare Workers are paid less than $25 per hour; and (5) actually implement these raises, costing potentially millions of dollars. Making these complicated determinations and implementations within a matter of weeks is impractical, if not outright impossible. Plaintiffs and their members have concerns about their ability (and the ability of all covered facilities) to determine which employees are covered and comply by August 13, 2022. Plaintiff CHA, in fact, asked for guidance from the City and has received no response as of July 14. *See* Ex. 6.

54. For example, implementing the Ordinance will be extraordinarily difficult for smaller clinics and hospitals like Plaintiff Barlow. Barlow does not have a separate payroll department or payroll specialist to ensure the timely implementation of this increase. Barlow also does not have staff qualified to assist it with determining which facilities are covered by the Ordinance, which employees fall within the definition of a Healthcare Worker, and whether (as discussed more fully below) it would be able to continue as a "going concern" (and how to present such a determination) if it had to comply with the Ordinance. Layered on top are complex state and federal laws and regulatory regimes that govern employee wages and the healthcare industry.

55. Second, many covered facilities (including Plaintiff Barlow) that currently are barely able to keep their doors open with their current wage structure are at risk of

---

[7] *See AltaMed Health Services Corporation Leads Healthcare Industry with a Living Wage Increase to a Minimum of $25 an Hour for Employees*, AltaMed (June 27, 2022), https://www.altamed.org/news/altamed-health-services-corporation-leads-healthcare-industry-living-wage-increase-minimum-25 ("AltaMed . . . has announced a living wage increase to $25 an hour **by 2025**.") (emphasis added).

closure once this wage increase goes into effect.  Many covered facilities (and non-covered ones as well) are operating at razor-thin margin lines or outright losing money.  Approximately one-third of healthcare facilities in Los Angeles currently operate in the red.  A minimum wage increase of 55% will devastate these facilities, and potentially deprive Angelenos of the necessary and specialized care that these facilities provide.

56.     Yet covered facilities are somehow expected to come up with additional revenue on this unrealistic truncated timeline.  But what a covered facility can charge for services is largely fixed and is dictated and regulated by federal, state, and local laws and government agencies.  For example, CMS controls the amount of reimbursement a covered facility receives under Medicare based on predetermined, fixed amounts.  *See Prospective Payments Systems—General Information*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/ProspMedicareFeeSvcPmtGen (last visited July 14, 2022).  These fixed amounts do not even come close to covering the actual costs of providing care to patients, as the statewide average shortfall of Medi-Cal compared to facilities' actual costs of providing care is at least 20%.  And studies found that hospitals do not make up for Medicare cuts by cost-shifting (that is, increasing prices to private insurers and other non-governmental payors).  Chapin White and Vivian Yaling Wu, *How Do Hospitals Cope with Sustained Slow Growth in Medicare Prices?*, Health Servs. Res. 49:1 at 13–14 (Feb. 2014), https://onlinelibrary.wiley.com/doi/pdf/10.1111/1475-6773.12101.

57.     Plaintiff Barlow is a case in point.  Barlow's year-to-date margin is currently -10%, meaning it has been operating well in the red this year.  This amounts to an approximate loss of $500,000 per month.  If the Ordinance is enforced as to Barlow, its margins will worsen.  With approximately 80% of its residents on government payor programs—all of which result in negative margins (including Medi-Cal revenue accounting for only 57% of the cost to treat Medi-Cal patients)—Barlow serves some of the City's most vulnerable communities.  It will not be able to increase

its revenue to offset the increase in labor costs, which currently account for approximately two-thirds of its expenses.  Therefore, if Barlow is forced to comply with the Ordinance, it will risk closure and the City of Los Angeles and Angelenos will be deprived of Barlow's specialized care.

58.     Nor can covered facilities like Barlow simply raise Medicare or Medicaid reimbursements to generate the revenue they need to comply with the Ordinance. Under the inpatient prospective payment system ("IPPS"), CMS calculates a national standard price for each service.  *Id.* at 13.  Raising Medicare and Medicaid standard prices does not occur overnight.  Covered facilities will have to wait years for CMS to propose a rule increasing payments for services.  With a growing Medicare and Medicaid population in California, and covered facilities' reliance on these payments, it is virtually impossible for covered facilities to implement a minimum wage increase of over 50% within 31 days without putting the covered facilities at risk of closure. *See* ATI Advisory, *Profile of the California Medicare Population*, Cal. Dep't of Health Care Servs. (Feb. 18, 2022), https://www.dhcs.ca.gov/services/Documents/OMII-Medicare-Databook-February-18-2022.pdf ("California's Medicare population grew 11.3% from 5.8 million in 2016 to 6.5 million in 2021."); *see also* Finnochio, Paci & Newman, *California Health Care Almanac 2021 Edition—Medi-Cal Facts and Figures Essential Source of Coverage for Millions*, Cal. Health Care Found. (Nov. 12, 2021), https://www.chcf.org/publication/2021-edition-medi-cal-facts-figures/ ("In total, over 13 million Californians – one in three – rely on [Medi-Cal] for health coverage.").

59.     Facilities that are most dependent on Medicare and Medi-Cal are often the ones most at risk of closure.  These facilities currently have the greatest financial difficulties and therefore will be hit the hardest by a labor cost increase with no practical way to increase revenue to cover it and no meaningful opportunity of obtaining a waiver to delay its implementation.  And because Medicare and Medi-Cal patients are often low income and from the most vulnerable communities in Los

Angeles, they will also suffer the effects of this wage increase through potential facility closure or reduction in services.

60.     This inadequate notice for implementing a 55% increase in the minimum wage is not mitigated by the Ordinance's authorization to seek a mere one-year court-approved waiver for facilities that are concerned about being able to remain a "going concern." *See* Ordinance § 187.57.  Preparing the application and actually receiving a judicial waiver within that time frame is impossible.  Nor is a one-year waiver sufficient to allow such a facility to continue as a going concern.  To obtain such a waiver, a facility would need to collect and prove through "substantial evidence" that there is "substantial doubt" about its ability to continue as a going concern under "generally accepted accounting standards," which has no standardized meaning; it needs to submit the necessary financial documentation before the Ordinance goes into effect; and a court would need to rule on this submission and grant a waiver before the Ordinance became effective.  All of this cannot possibly happen by the time that the Ordinance goes into effect and the covered facilities are legally obligated to pay the minimum wage increase.  Exacerbating this difficulty is that a court would need to decide what the proper procedure is for seeking such a waiver, what constitutes "substantial doubt," and what evidence is "substantial."  Therefore, it is impossible for a potentially covered facility to obtain a waiver before the Ordinance goes into effect, which amounts to insufficient notice to take advantage of the purported remedy of a waiver.

## COUNT I

### Violation of the U.S. Constitution's Equal Protection Clause

61.     Plaintiffs incorporate by reference all other paragraphs of this Complaint.

62.     The Ordinance's definition of Covered Healthcare Facility violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because it is not rationally related to a legitimate governmental interest and likely defeats its purported governmental interest.

63.    First, covered healthcare facilities, such as private hospitals or clinics affiliated with private hospitals, are similarly situated in all relevant respects to non-covered healthcare facilities, such as community health clinics, family planning clinics, or private clinics. Yet the City has adopted a classification that affects similarly situated groups in an unequal manner.

64.    Second, the reasons given for the Ordinance stand at complete odds with the arbitrary lines drawn by the definition of Covered Healthcare Facility. The limited definition of Covered Healthcare Facility has no rational relationship with the Ordinance's stated purpose of solving "the burnout, retention challenges, and worker shortages affecting healthcare workers in Los Angeles." Ordinance § 187.50. That definition does not rationally separate facilities on the basis of staffing shortages or workforce turnover. In fact, many non-covered facilities suffer from higher rates of shortages and turnover than covered facilities.

65.    Third, and significantly, the Ordinance's classification *undermines* its stated ends. By arbitrarily imposing an increased minimum wage on only a subset of healthcare facilities in Los Angeles, the Ordinance threatens to increase staffing shortages and workforce turnover in non-covered facilities, which suffer from higher rates of shortages and turnover. This is not a case where a law operates incrementally where progress is most needed. No rational actor would pursue a course of action that exacerbates the problem it seeks to address. Put another way, taking the Ordinance's "own rationale" for its coverage definition shows that "there is not a legitimate interest implicated by the classification." *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008).

66.    Nor is there any other rational basis to explain why certain facilities are covered and other are not covered under the Ordinance. Covered healthcare facilities do not accept any benefit from the City in exchange for the increased minimum wage.

67.    Moreover, laws may not draw lines for the purpose of arbitrarily excluding or including persons as a concession to one political constituent or group;

1   there must be a rational basis for such line drawing.  Yet the definition of Covered

2   Healthcare Facility includes dialysis clinics for no reason "other than to respond to the

3   demands of a political constituent." *Fowler Packing Co. v. Lanier*, 844 F.3d 809, 815

4   (9th Cir. 2016).  Here, there is no rational reason for the inclusion of dialysis clinics as

5   covered facilities.

6          68.   In sum, the Ordinance's different treatment of similarly situated

7   healthcare facilities does not bear a rational relationship for the distinction.  To the

8   contrary, the irrational classifications and means adopted by the Ordinance to *decrease*

9   staffing shortages and workforce turnover threaten to *increase* the rates of shortages

10   and turnover where they are most prevalent—in non-covered facilities.  And some

11   facilities are covered solely because of a political group's demands.  For any and all of

12   these reasons, the Ordinance is not rationally related to any legitimate end.

13          69.   Plaintiffs have no adequate remedy at law.  Plaintiffs and their member

14   organizations will also suffer immediate and irreparable injury unless this Court

15   enjoins—preliminarily and permanently—enforcement of the Ordinance.  Enforcement

16   of and compliance with the Ordinance will severely impact the financial health of

17   individual Plaintiffs and of CHA's and HASC's members, and their ability to service

18   the community, while non-compliance will subject the Plaintiffs, their members, and

19   other covered facilities to excessive fines and other private legal action.

20          70.   Plaintiffs are also entitled to a judicial declaration because it is necessary

21   and appropriate at this time.  Plaintiffs and Defendants are in a fundamental

22   disagreement over the application and constitutionality of the Ordinance.  Plaintiffs,

23   their members, and other covered facilities also will be at risk of excessive fines and

24   other private legal action if they somehow violate this unconstitutional Ordinance.

25   Plaintiffs therefore request a judicial declaration that the Ordinance is unconstitutional,

26   in whole or in part.

27

28

## <u>COUNT II</u>

### Violation of the California Constitution's Equal Protection Clause

71.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs in this Complaint.

72.    For substantially the same reasons as described in Count I, the Ordinance violates Article 1, Section 3(b)(4) of the California Constitution.

73.    The enforcement of the Ordinance against Plaintiffs and their members will deprive them of equal protection under the law in violation of Article I, Section 7 of the California Constitution.  The City has adopted an Ordinance that affects two similarly situated groups in an unequal manner, and the distinctions drawn by the Ordinance do not bear a rational relationship to a legitimate governmental purpose.

74.    Plaintiffs have no adequate remedy at law.  Plaintiffs and CHA's and HASC's members will also suffer immediate and irreparable injury unless this Court enjoins—preliminarily and permanently—enforcement of the Ordinance.  Compliance with the Ordinance will severely impact the financial health of the individual Plaintiffs and of CHA's and HASC's members, and their ability to service their community, while non-compliance will subject the Plaintiffs, their members, and other covered facilities to excessive fines and other private legal action.

75.    Plaintiffs are also entitled to a judicial declaration because it is necessary and appropriate at this time as Plaintiffs and Defendants are in a fundamental disagreement over the application and constitutionality of the Ordinance.  Plaintiffs, their members, and other covered facilities also will be at risk of excessive fines and other private legal action if Plaintiffs or their members somehow violate this unconstitutional Ordinance.  Plaintiffs therefore request a judicial declaration that the Ordinance is unconstitutional, in whole or in part.

Gibson, Dunn &
Crutcher LLP

## COUNT III

### Violation of the U.S. Constitution's Due Process Clause

76.     Plaintiffs hereby incorporate by reference all of the foregoing paragraphs in this Complaint.

77.     The Ordinance violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV, § 1.  Principles of procedural due process under the United States Constitution require that the government give citizens fair notice of a statute and how it will be applied against such citizens.

78.     If the Due Process Clause applies, "the question remains what process is due."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  Such a question "is flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

79.     The enforcement of the Ordinance against Plaintiffs and their members will deprive them of their procedural due process rights in violation of the United States Constitution.  The Ordinance violates procedural due process in at least two respects:  (1) the Ordinance does not provide covered facilities with sufficient notice to timely comply with the new minimum wage; and (2) the covered facilities have not been provided sufficient notice to seek and timely obtain a one-year waiver from the Ordinance's applicability.

80.     First, the Ordinance violates due process by not providing covered facilities with sufficient notice or a sufficient specification of the covered workers to timely comply with the law.

       a.  Plaintiffs have a property interest in the revenue received from patients, insurers, Medicare, and Medi-Cal.  Plaintiffs also have an interest in any revenue that may be forfeited as a result of penalties for

failure to comply with the Ordinance.  However, the Ordinance's 31-day notice deprives covered facilities of sufficient notice to timely come into compliance, forcing them to modify complicated payroll systems that implicate complex state and federal regulatory regimes within a matter of weeks.

b.  Specifically, the Ordinance becomes effective 31 days after publication, which was on July 13, 2022.  *See* Los Angeles Charter, vol. I, art. II, § 252.  Therefore, the Ordinance goes into effect on August 13, 2022.  This means that the Covered Facilities have 30 days to update payroll and ensure that all covered employees are paid the necessary rate.  This is not adequate notice and no rationale reason supports such inadequate notice.

c.  Pay and costs within the medical field also are highly complicated, as courts recognize.

d.  Exacerbating the procedural due process deprivation caused by the inadequate notice to timely comply with the Ordinance are the ambiguous definitions as to who is specifically a "Healthcare Worker." The City will almost assuredly need to provide substantial interpretive guidance as to who is a "Healthcare Worker."  For instance, the list of "Healthcare Workers" includes a "professional," "non-professional," and "aide," without further description.  *See* Los Angeles Municipal Code § 187.51(G).  Yet, these are not used as a "catch-all" phrase, but are part of a list of specific positions, such as "maintenance worker" or "housekeeping staff person."  It is unclear whom these categories refer to.  Moreover, the general definition of "healthcare worker" is limited to those who provide "patient care, healthcare services," or "services supporting the provision of healthcare."  It is unclear how broadly the phrase of a worker "supporting the provision of healthcare" is to be

interpreted.  In fact, the Ordinance contemplates the need for rules and regulations, *see id.* § 187.54(B), but there practically will be no such guidance by the time that the Ordinance goes into effect (and certainly not by the time that facilities must begin their attempts to comply with the Ordinance).  Accordingly, not only must covered facilities determine whether they are, in fact, a covered facility, and who is a covered "Healthcare Worker," but they must then determine how to restructure their pay structure.  Plaintiff CHA, in fact, requested guidance from the City, but has received no response.  *See* Ex. 6.

e. The City has provided no legitimate basis for requiring such a short 31-day implementation period.

81.   Second, the Ordinance also violates Plaintiffs' due process right by not providing facilities with adequate notice to seek and obtain the statutorily provided "one-year court-granted waiver" from the Ordinance's applicability.  *See* Los Angeles Municipal Code § 187.57.  The 31-day notice by which the Ordinance takes effect fails to grant Plaintiffs and their members adequate time to determine whether they qualify for the waiver, to prepare the documentation necessary to establish the right to the waiver, to seek the waiver, and to obtain the waiver.  This places those facilities' very existence at risk.

a. Specifically, the Ordinance offers a one-year court-granted waiver upon a showing that compliance with the Ordinance would result in "substantial doubt about the [facility's] ability to continue as a going concern under generally accepted accounting standards."  *See id.*

b. As a practical matter, it is impossible that a court would rule on any requested waiver by the time the Ordinance goes into effect (August 13, 2022).  This is particularly true where the procedures for seeking a waiver have not been fleshed out because, again, regulatory insight may be necessary.  For example, "generally accepted accounting

standards"—the phrase used in the Ordinance—as opposed to generally accepted accounting practices, is not an industry-defined term. Therefore, what constitutes "generally accepted accounting standards" for purposes of obtaining a waiver will require regulatory guidance.

c. The nature of the necessary evidence to obtain such a waiver demonstrates that it would be impossible to obtain and prepare the necessary documentation within 30 days. Under the Ordinance, "The evidence must include documentation of the Employer's financial condition, as well as the condition of any parent or affiliated entity, and evidence of the actual or potential direct financial impact of compliance with this article." *Id.*

d. Further, even assuming the documentation could be processed and prepared within 31 days, it is unreasonable to expect that a court could rule on a waiver based on complex financial data and accounting before the expiration of the 31-day period. Absent such a ruling, facilities at risk of closure will be forced to comply with the Ordinance because of the impossibility of obtaining a waiver before the Ordinance's enactment.

e. By contrast, the Ordinance could have provided for a Controller-approved or other department-approved waiver requirement, which is the waiver that was put into place for other "living wage" ordinances.

82. For the reasons set forth above, the Ordinance also deprives Plaintiffs and their members of their substantive due process. The Ordinance threatens Plaintiffs and their members' liberty and property without a sufficient purpose. The Ordinance's justification bears no relation to its implementation, thereby violating Plaintiffs' substantive due process rights.

83.     Plaintiffs have no adequate remedy at law.  Plaintiffs will also suffer immediate and irreparable injury unless this Court enjoins—preliminarily and permanently—enforcement of the Ordinance.  Specifically, failure to comply with the Ordinance within the inadequate time allowed, or to receive the one-year judicial waiver within 31 days will subject the Plaintiffs and their members to excessive fines and other private legal actions that will impair their financial condition and ability to serve their surrounding community.  This, in turn, will severely impact the financial health of the individual Plaintiffs and of CHA's and HASC's members, and their ability to service their community.

84.     Plaintiffs are also entitled to a judicial declaration because it is necessary and appropriate at this time as Plaintiffs and Defendants are in a fundamental disagreement over the application and constitutionality of the Ordinance.  Plaintiffs, their members, and other covered facilities also will be at risk of excessive fines and other private legal action if Plaintiffs or their members somehow violate the vague and unconstitutional Ordinance.  Plaintiffs therefore request a judicial declaration setting forth the parties' rights and obligations with respect to the Ordinance, including, but not limited to, a determination that the Ordinance may not take effect until the Defendant City (i) issues guidance as to the interpretation of the Ordinance, and (ii) either provides adequate time thereafter, as determined by the court, for the Plaintiffs, their members, and covered facilities to either seek and obtain a one-year judicial waiver or make the arrangements to comply with the Ordinance once the City's guidance has been issued.

## COUNT IV

### Violation of the California Constitution's Due Process Clause

85.     Plaintiffs incorporate by reference the foregoing paragraphs in this Complaint.

86.     For substantially the same reasons set for in Count III, the Ordinance violates the Due Process Clause of Article I, Section 7 of the California Constitution.

87.     Plaintiffs have no adequate remedy at law.  Plaintiffs will also suffer immediate and irreparable injury unless this Court enjoins—preliminarily and permanently—enforcement of the Ordinance.  Specifically, failure to comply with the Ordinance within the inadequate time allowed, or to receive the one-year judicial waiver within 31 days will subject the Plaintiffs and their members to excessive fines and other private legal actions that will impair their financial condition and ability to serve their surrounding community.  This, in turn, will severely impact the financial health of the individual Plaintiffs and of CHA's and HASC's members, and their ability to service their community.

88.     Plaintiffs are entitled to a judicial declaration because it is necessary and appropriate at this time as Plaintiffs and Defendants are in a fundamental disagreement over the application and constitutionality of the Ordinance.  Plaintiffs, their members, and other covered facilities also will be at risk of excessive fines and other private legal action if Plaintiffs or their members somehow violate the unconstitutional Ordinance.  Plaintiffs therefore request a judicial declaration setting forth the parties' rights and obligations with respect to the Ordinance, including, but not limited to, a determination that the Ordinance may not take effect until the Defendant City (i) issues guidance as to the interpretation of the Ordinance, and (ii) either provides adequate time thereafter, as determined by the court, for Plaintiffs to either seek and obtain a one-year judicial waiver or make the arrangements to comply with the Ordinance once the guidance has been issued.

### All Counts:  The Ordinance Will Cause Irreparable Injury to Plaintiffs

89.     Plaintiffs and their members will be severely and irreparably injured by the Ordinance once it takes effect.  If the Ordinance is allowed to go into effect, Plaintiffs and their members who are "Covered Healthcare Facilities" will be forced to increase wages of numerous employees under threat of penalties, and this, in turn, will affect the future operations of Plaintiffs and their members.  Once those wages are increased, Plaintiffs and their members cannot later reduce those wages if the

1  Ordinance is later deemed unconstitutional.  There is no practical way to unring that

2  bell.  Thus, the harm from this unconstitutional Ordinance cannot be remedied.

3      90.    Moreover, for some Plaintiffs and some of their members, if the

4  Ordinance is put into effect, they will be placed in the unenviable position of deciding

5  whether to keep their doors open despite substantial concerns about their ability to

6  continue as a "going concern" or shut down and cease providing services to the

7  communities that rely on their medical services.  These injuries can be redressed only

8  if this Court declares the Ordinance unconstitutional and enjoins Defendants from

9  enforcing it.

## PRAYER FOR RELIEF

Plaintiffs ask this Court to order appropriate relief, including, but not limited to, the following:

1.    A judicial declaration that the Ordinance is unconstitutional as it violates Plaintiffs and their members' rights under the Equal Protection Clauses and the Due Process Clauses of the United States and California Constitutions;

2.    A preliminary and permanent injunction enjoining Defendants from enforcing or taking any action under the Ordinance;

3.    An award of Plaintiffs' attorneys' fees and costs incurred in connection with this matter; and

4.    Such other and further relief as the Court may deem just and necessary.

Gibson, Dunn &
Crutcher LLP

1    Dated:  July 14, 2022

2

3                                              GIBSON, DUNN & CRUTCHER LLP

4

5                                              By:  */s/ Maurice Suh*
                                                        Maurice Suh

6                                              Attorneys for Plaintiff California Health
                                               Association
7

8

9                                              BELL, MCANDREWS & HILTACHK, LLP

10

11                                             By:  */s/ Thomas W. Hiltachk*
                                                        Thomas W. Hiltachk

12                                             Attorneys for Plaintiffs Barlow Respiratory
                                               Hospital; PIH Health Good Samaritan Hospital;
13                                             Providence Holy Cross Medical Center; Hospital
                                               Association of Southern California
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

33