GIBSON, DUNN & CRUTCHER LLP
MAURICE SUH, SBN 147485
  msuh@gibsondunn.com
JEREMY S. SMITH, SBN 283812
  jssmith@gibsondunn.com
ANDREW M. KASABIAN, SBN 313210
  akasabian@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

BELL, MCANDREWS & HILTACHK LLP
THOMAS W. HILTACHK, SBN 131215
  tomh@bmhlaw.com
BRIAN T. HILDRETH, SBN 214131
  bhildreth@bmhlaw.com
PAUL T. GOUGH, SBN 75502
  pgough@bmhlaw.com
455 Capitol Mall, Suite 600
Sacramento, CA 95814
Telephone:  916.442.7757
Facsimile:  916.442.7759

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARLOW RESPIRATORY HOSPITAL; PIH HEALTH GOOD SAMARITAN HOSPITAL; PROVIDENCE HOLY CROSS MEDICAL CENTER; HOSPITAL ASSOCIATION OF SOUTHERN CALIFORNIA, an Incorporated California Nonprofit Membership Association; and CALIFORNIA HOSPITAL ASSOCIATION, an Incorporated California Nonprofit Membership Association, | CASE NO. 2:22-CV-04828-JLS-GJS |
| | **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | **[Fed. R. Civ. P. 65]** |
| v. | Hearing Date: TBD*<br>Time: TBD<br>Place: Courtroom 8A<br>Judge: Hon. Josephine L. Staton |
| CITY OF LOS ANGELES; OFFICE OF WAGE STANDARDS FOR THE CITY OF LOS ANGELES; ERIC GARCETTI, in his official capacity as Mayor of Los Angeles; and DOES 1-20, | *Plaintiffs have concurrently filed a motion to expedite consideration of this motion to allow a decision before the challenged law goes into effect. |
| Defendants. | |

Gibson, Dunn &
Crutcher LLP

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on August 5, 2022, at the time most convenient to this Court, pursuant to Federal Rule of Civil Procedure 65(a),[1] Plaintiffs Barlow Respiratory Hospital, PIH Health Good Samaritan Hospital, Providence Holy Cross Medical Center, Hospital Association of Southern California, and California Hospital Association move for a preliminary injunction enjoining enforcement, pending final judgment, of any provision of Los Angeles Ordinance No. 187566 by Defendants City of Los Angeles, Office of Wage Standards for the City of Los Angeles, Mayor Eric Garcetti, and any officers, agents, servants, employees, and attorneys of the City of Los Angeles.  The reasons for granting the motion are set forth in the accompanying Memorandum of Points and Authorities.

Plaintiffs request that bond be waived or that the court establish a nominal bond. This Court may waive the security requirements set forth in Federal Rule of Civil Procedure 65(c) or establish a nominal bond.  *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).  Moreover, the court may waive the bond requirement if imposing a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected by the policy."  *Baca v. Moreno*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

---

[1] Plaintiffs have concurrently filed a motion to expedite consideration of this motion to allow a decision before the challenged law goes into effect on August 13, and has proposed August 5 as the hearing date to allow the Court to have adequate time to consider the constitutional issues raised in this case.

Dated:  July 15, 2022

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____*/s/ Maurice Suh*_____
Maurice Suh

Attorneys for Plaintiff California Health Association

BELL, MCANDREWS & HILTACHK, LLP

By: _____*/s/ Thomas W. Hiltachk*_____
Thomas W. Hiltachk

Attorneys for Plaintiffs Barlow Respiratory Hospital; PIH Health Good Samaritan Hospital; Providence Holy Cross Medical Center; Hospital Association of Southern California

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1

## **TABLE OF CONTENTS**

2  INTRODUCTION ............................................................................................... 1

3  FACTUAL BACKGROUND.............................................................................. 4

4     I.    The City's Slapdash Implementation of a Lopsided Proposal for a
             Minimum Wage Hike at Healthcare Facilities........................................ 4
5
       II.   The Predicament Faced by Covered Healthcare Facilities ..................... 6
6
       III.  Dire Circumstances Bring Plaintiffs to Court........................................ 8
7
8  LEGAL STANDARD......................................................................................... 11

9  ARGUMENT ..................................................................................................... 12

10     I.    Plaintiffs Are Likely to Succeed on the Merits ................................... 13

11        A.    The Ordinance's Irrational Linedrawing Between Covered and
                   Non-Covered Facilities Violates the Equal Protection Clause. ........ 13
12
             B.    The Ordinance's Inadequate Notice and Waiver Process Deprives
13                   Plaintiffs of Procedural Due Process. ............................................. 19

14     II.   The Unconstitutional Ordinance Will Cause Plaintiffs Irreparable Harm.......23

15     III.  The Balance of Equities and Public Interest Tip Sharply in Plaintiffs'
             Favor..................................................................................................... 24

16  CONCLUSION.................................................................................................. 25

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ajilon Pro. Staffing, LLC v. Griffin,*
2009 WL 976522 (D. Ariz. Apr. 10, 2009) ............................................................. 24

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .............................................................................. 11

*Allied Concrete & Supply Co. v. Baker,*
904 F.3d 1053 (9th Cir. 2018) .............................................................................. 16

*Am. Tower Corp. v. City of San Diego,*
763 F.3d 1035 (9th Cir. 2014) .............................................................................. 20

*Am. Trucking Ass'ns Inc. v. City of Los Angeles,*
559 F.3d 1046 (2009) ........................................................................................... 23

*Ariz. Dream Act Coal. v. Brewer,*
855 F.3d 957 (9th Cir. 2017) ........................................................................... 3, 25

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.,*
149 F.3d 971 (9th Cir. 1998) ................................................................................ 19

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ............................................................................................. 13

*Craigmiles v. Giles,*
312 F.3d 220 (6th Cir. 2002) ................................................................................ 15

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) .............................................................................. 25

*Forbes v. Napolitano,*
236 F.3d 1009 (9th Cir. 2000) .............................................................................. 21

*Fortuna Enter., L.P. v. City of Los Angeles,*
673 F. Supp. 2d 1000 (C.D. Cal. 2008) ........................................................... 19, 22

*Fowler Packing Co. v. Lanier,*
844 F.3d 809 (9th Cir. 2016) ....................................................................... 2, 14, 15

i

*Garcia v. Four Points Sheraton LAX*,
    188 Cal. App. 4th 364 (2010) ................................................................. 19

*Hartford Steam Boiler Inspection & Ins. Co. v. Harrison*,
    301 U.S. 459 (1937) ............................................................................... 16

*Hays v. Wood*,
    25 Cal. 3d 772 (1979) ..................................................................... 13, 16

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ................................................................ 12

*Hufford v. McEnaney*,
    249 F.3d 1142 (9th Cir. 2001) .............................................................. 19

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) .......................................................... 3, 25

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ......................................................... 2, 20, 21, 22

*Med-Cert Home Care, LLC v. Azar*,
    365 F. Supp. 3d 742 (N.D. Tex. 2019) ............................................ 20, 25

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ................................................................ 25

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008) ..................................................... 13, 15, 17

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ............................................................. 3, 23

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ............................................................................... 23

*Nelson v. NASA*,
    530 F.3d 865 (9th Cir. 2008) .......................................................... 23, 24

*New Orleans v. Dukes*,
    427 U.S. 297 (1976) ............................................................................... 15

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................... 25

ii

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) ................................................................................................. 13

*O'Neal v. City of Seattle*,
    66 F.3d 1064 (9th Cir. 1995) ............................................................................ 16

*Ong v. Tovey*,
    552 F.2d 305 (9th Cir. 1977) ............................................................................ 20

*Railway Express Agency, Inc. v. New York*,
    336 U.S. 106 (1949) ............................................................................................ 16

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ......................................................................... 12

*RUI One Corp. v. City of Berkeley*,
    371 F.3d 1137 (9th Cir. 2004) ......................................................................... 19

*Ryan v. Cal. Interscholastic Federation-San Diego Section*,
    94 Cal. App. 4th 1048 (2002) ................................................................... 19, 20

*Saleeby v. State Bar*,
    39 Cal. 3d 547 (1985) ........................................................................................ 20

*Ex parte Scaranino*,
    7 Cal. 2d 309 (1936) .......................................................................................... 16

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2011) ...................................................................... 3, 12

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ............................................................................ 18

*Walgreen Co. v. City and County of San Francisco*,
    185 Cal. App. 4th 424 (2010) ..................................................................... 17, 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................... 11

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XIV, § 1 ................................................................................ 13, 19

Cal. Const. art. I, § 7 ............................................................................................... 13, 19

iii

Gibson, Dunn &
Crutcher LLP

Los Angeles Charter § 252 ........................................................................... 6

Los Angeles Charter § 452 ........................................................................... 5

**STATUTES**

Los Angeles Municipal Code § 186.09 ....................................................... 23

Los Angeles Municipal Code § 187.50 ....................................... 4, 5, 14, 18, 24

Los Angeles Municipal Code § 187.51 ........................................ 4, 14, 15, 21

Los Angeles Municipal Code § 187.52 ......................................................... 7

Los Angeles Municipal Code § 187.54 .................................................... 8, 21

Los Angeles Municipal Code § 187.57 ................................................ 7, 21, 22

Los Angeles Municipal Code § 188.05 ......................................................... 8

Los Angeles Municipal Code § 188.07 .................................................... 8, 20

Los Angeles Municipal Code § 188.08 .................................................... 8, 20

Los Angeles Ordinance No. 187566 ............................................................. 5

**OTHER AUTHORITIES**

Holly L. Wolcott, City Clerk, *Certification of Sufficiency of an Ordinance Initiative Petition: Minimum Wage for Healthcare Employees Working at Healthcare Facilities*, City of Los Angeles (June 10, 2022), https://lacity.primegov.com/meeting/attachment/409834.pdf?name=Report%20from%20City%20Clerk%20dated%206-10-22 ................................................................ 5

https://www.seiu-uhw.org/winning25minwage/ ........................................... 4

*July 1, 2022 Minimum Wage Ordinance Wage Rate Increase*, Mayor Eric Garcetti (Feb 1, 2022), https://wagesla.lacity.org/sites/g/files/wph1941/files/2022-02/2022%20MWR%20Increase%20Notice.pdf ......................................... 4

Lauren Rosenhall, *Good Policy or Ballot Blackmail? Union Keeps Taking Its Fights with Health Industry to Voters*, Cal Matters (Oct. 20, 2020), https://calmatters.org/politics/california-election-2020/2020/10/california-healthcare-union-proposition-23/ ....................................................... 15

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

Gibson, Dunn & Crutcher LLP

*New Report: California Hospitals Face Massive Financial Losses Due to COVID-19 Pandemic; 2021 Shortfall Triple Previous Projections*, Cal. Hosp. Ass'n (Apr. 21, 2022), https://calhospital.org/new-report-california-hospitals-face-massive-financial-losses-due-to-covid-19-pandemic-2021-shortfall-triple-previous-projections ................................................................................................ 7, 18

*Regular City Council—6/21/22* (June 21, 2022),
   https://www.youtube.com/watch?v=NyKEaI_vPS8 ................................................. 5

Victoria Colliver, *Inside a California Health Care Union's Obsession with Kidney Dialysis Initiatives*, Politico (Nov. 19, 2021),
   https://www.politico.com/states/california/story/2021/11/19/inside-a-california-health-care-unions-obsession-with-kidney-dialysis-initiatives-1394715 ................ 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn & Crutcher LLP

v

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Without this Court's intervention, Plaintiff Barlow Respiratory Hospital and likely many more of Los Angeles's critically important hospitals and healthcare facilities expect to close their doors because of an unconstitutional ordinance set to go into effect in just 29 days—on August 13.  Others, including Gateways Hospital and Mental Health Center and Mission Community Hospital, along with countless other health facilities across the City, believe they may be forced to materially cut their services to some of the City's most vulnerable populations.  Plaintiffs seek a preliminary injunction—that need not last more than months—so that the Court can determine whether the City's new ordinance passes constitutional muster before it wreaks havoc on Plaintiffs and the entire healthcare system in Los Angeles, thereby harming the community's access to care.  The ordinance became law on July 13, and plaintiffs have moved promptly to seek relief.

The ordinance at the center of this case, Ordinance No. 187566, seeks to raise the minimum wage of healthcare workers in the City of Los Angeles to $25 per hour—a 55% increase.  *See* Dkt. 1-1.  But it applies only to workers at ***some*** healthcare facilities in Los Angeles, and there is no rational basis for who is in and who is out.  Nearly all workers—from nurses to janitors to kitchen staff—at private hospitals, clinics associated with such hospitals, and dialysis clinics will be entitled to a minimum wage of $25 an hour.  But workers with the exact same job, possibly just down the street or a few blocks away, will be entitled to a minimum wage of $16.04 if they work at facilities ranging from for-profit healthcare clinics (other than dialysis clinics), community health clinics, federally qualified healthcare clinics, ambulatory surgery centers, to family planning clinics.  This makes no sense.  Take, for example, a private plastic surgery clinic on Sunset Blvd. caring for the latest celebrity on Real Housewives of Beverly Hills versus a plastic surgery clinic associated with Children's Hospital of Los Angeles.  The celebrity clinic need not pay its employees $25 per hour, but the plastic surgery clinic affiliated with Children's Hospital must.

Because there is no rational basis for why this Ordinance singles out some, but not all, healthcare facilities across the City and provides some, but not all, healthcare workers in the City a 55% raise in the minimum wage, Plaintiffs are likely to prevail on the merits.  The Equal Protection Clauses of the U.S. and California Constitutions forbid classifications that include or exclude similarly situated persons without adequate justification.  Put differently, line drawing of who is in and who is out must be "rationally related to a legitimate government interest."  *Fowler Packing Co. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016).  Because no rational basis can justify the Ordinance's distinction between covered and non-covered facilities, and because fragmenting similarly situated facilities into two camps actually *undermines* the stated objective of addressing staffing shortages (it incentivizes workers to leave healthcare facilities that are not covered), Plaintiffs are likely to succeed on their equal protection claims.

Plaintiffs also have a likelihood of prevailing on their procedural due process claims.  Thirty-one days' notice is not adequate for even the nimblest healthcare provider to implement a 55% rise in the minimum wage, when (1) the Ordinance is sufficiently vague regarding the employees covered by its terms, such that regulatory guidance from the City will first be required; (2) even if the definition was clearer, implementation of such a sweeping change in 31 days is impractical; and (3) nearly all of its revenue is set by the government in the form of Medicare, Medi-Cal, and grants, or based on long-term contracts (typically two- or three-year terms) with private insurers that can be adjusted only after negotiations that can take months.  Acknowledging the serious risk posed by the minimum wage increase, the Ordinance includes a one-year waiver provision for facilities like Barlow that could cease to be a "going concern."  But it is infeasible—in just 31 days—for Barlow and many other healthcare providers to gather the necessary "evidence of the actual or potential direct financial impact of compliance" *and* then receive a *court* determination.  Past minimum wage ordinances, in contrast, established clear procedures that could promptly resolve waiver requests.  Accordingly, Plaintiffs are likely to succeed under the balancing test set by *Mathews v. Eldridge*, 424 U.S. 319,

Gibson, Dunn & Crutcher LLP

334–35 (1976), on their claims that the 31-day notice period and illusory waiver process are unconstitutional.

At a bare minimum, the equal protection or due process claims in this case raise "serious questions," which is all Plaintiffs need to show for a preliminary injunction because "the balance of hardships tips sharply" in Plaintiffs' favor. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2011) (cleaned up). The equities always "favor preventing the violation of a party's constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). And the City has no "legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

The irreparable harm that will occur absent a preliminary injunction is also overwhelming. Constitutional violations always constitute irreparable harm. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). But here it is much worse than that. Barlow expects to close if the Ordinance goes into effect. And Barlow is far from alone. As Dr. Henry Miller, who has 50 years of experience as a healthcare consultant and researcher, explains in his declaration, if the Ordinance takes effect on August 13, (1) there is a high likelihood that some covered and non-covered healthcare facilities in Los Angeles will close, ultimately reducing access to care, and (2) it will be extremely difficult, if not impossible, for covered facilities to roll back the wage increases, were this Court to invalidate the Ordinance at final judgment. Others will likely have to significantly curtail services, often to the neediest populations. This will hurt the City's most vulnerable patients and cause thousands of employees to lose their jobs.

Absent a short preliminary injunction, there is no possible reprieve. Barlow, Gateways, Mission Community, Good Samaritan, Holy Cross, and every other facility in Los Angeles who may qualify for the Ordinance's waiver cannot possibly obtain it by the effective date—August 13. And there is simply no way to unring these bells. The Court should grant the request for a preliminary injunction and put this case on an expedited schedule to determine the constitutionality of the Ordinance.

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

# FACTUAL BACKGROUND

## I.    The City's Slapdash Implementation of a Lopsided Proposal for a Minimum Wage Hike at Healthcare Facilities

The story of this ordinance begins with a ballot initiative sponsored by a labor union, Service Employees International Union-United Healthcare Workers, called SEIU-UHW.[2]  The initiative proposed to raise the minimum wage to $25 per hour for workers at certain private healthcare facilities in the City of Los Angeles—purportedly to address "the burnout, retention challenges, and worker shortages affecting healthcare workers in Los Angeles."  Los Angeles Municipal Code § 187.50.

The proposed wage provisions would apply to a patchwork of "Covered Healthcare Facilities," a subset of "privately owned" facilities "located within the boundaries of the City": licensed general acute care hospitals, outpatient clinics part of a general acute care hospital, skilled nursing facilities, chronic dialysis clinics, acute psychiatric hospitals and outpatient clinics and residential care facilities for the elderly associated with acute psychiatric hospitals, and integrated healthcare delivery systems. *See id.* § 187.51(B).  An integrated healthcare delivery system is further defined as one or more hospitals, physician groups, or clinics that are related through common ownership or control, a contractual relationship between the hospitals/physician groups/clinics, or a nonprofit healthcare service plan.  *Id.* § 187.51(H).

This random collection of covered employers leaves out more than half of the City's healthcare workers, many of whom work for community centers, family planning clinics, plastic surgery practices, public hospitals, and more.  Declaration of Henry Miller, Ph.D. ("Miller Decl.") ¶ 9.  The two-track system proposed by the initiative would guarantee the majority of healthcare workers only $16.04 per hour and the new select minority $25 per hour (a 55% increase).[3]

---

[2]  *See* https://www.seiu-uhw.org/winning25minwage/.

[3]  *See July 1, 2022 Minimum Wage Ordinance Wage Rate Increase*, Mayor Eric Garcetti (Feb 1, 2022), https://wagesla.lacity.org/sites/g/files/wph1941/files/2022-02/2022%20MWR%20Increase%20Notice.pdf.

Gibson, Dunn & Crutcher LLP

After the union gathered a sufficient number of signatures to qualify the initiative petition, the City Council had three options: (1) "adopt the proposed ordinance, without alteration"; (2) call for a special election by the voters; or (3) submit the ordinance to the voters at the next regular city or state election.  Los Angeles Charter § 452(b).  The City Clerk recommended option (3), which would have allowed Angelenos to vote on the proposal during the November 2022 election.[4]  After the City Clerk weighed in, the City Council received letters from healthcare facilities and heard from individuals at a public hearing.  The overriding message was that the City Council should follow the City Clerk's message to place the initiative on the ballot—again, option (3).  *See* Dkts. 1-2 to 1-5; Declaration of Thomas W. Hiltachk ("Hiltachk Decl.") ¶¶ 3–6.  Some pointed out that "[i]f the City Council passed this Ordinance," it "will be picking winners and losers in the healthcare workforce" by excluding the "[m]ajority of healthcare workers."[5]  Others warned that the uneven increase would hamstring the ability of "very fragile community and public health facilities" not covered by the proposal to "compete with the private facilities" for an already-insufficient pool of healthcare workers.[6]

Parting ways with these recommendations, the City Council chose option (1) and enacted the proposal on June 29, 2022.  Los Angeles Ordinance No. 187566 (codified at Los Angeles Municipal Code §§ 187.50–.59), Dkt. 1-1.  This approach meant that the City could not "alter[]" the scope of the Ordinance to fix the problems of partial, sporadic coverage.  Los Angeles Charter § 452(b)(1).  It also set off a mad dash for healthcare facilities to comply with the Ordinance, which advances the effective date up to "the *earliest* date allowed by law."  Los Angeles Ordinance No. 187566, § 4 (emphasis

---

[4]  *See* Holly L. Wolcott, City Clerk, *Certification of Sufficiency of an Ordinance Initiative Petition: Minimum Wage for Healthcare Employees Working at Healthcare Facilities*, City of Los Angeles (June 10, 2022), https://lacity.primegov.com/meeting/attachment/409834.pdf?name=Report%20from%20City%20Clerk%20dated%206-10-22.

[5]  *See Regular City Council—6/21/22*, YouTube.Com at 54:40–55:48 (June 21, 2022), https://www.youtube.com/watch?v=NyKEaI_vPS8.

[6]  *See, e.g.*, *id.* at 1:27:13–1:28:45.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

added).  That date is August 13, 2022, because the Ordinance was signed by Mayor Garcetti on July 8, 2022, and was published on July 13, 2022.  *See* Los Angeles Charter § 252 ("An ordinance shall go into effect 31 days from its publication.").  This rushed process has deprived the healthcare industry of the time for planning for these sweeping changes that they would have had if the initiative process had moved forward to a November election as originally planned.

## II.    The Predicament Faced by Covered Healthcare Facilities

Complying with the Ordinance is not just a matter of changing numbers in a computer system.  Approximately 35% of healthcare workers at covered facilities currently make less than $25 per hour.  *See* Miller Decl. ¶ 9.  Put in practical terms, covered facilities must increase revenues—for some, to the tune of millions of dollars— to comply with the Ordinance by August 13, 2022.  That is a mere 29 days from now.

Most businesses raise prices when their costs go up.  As Americans have seen over the past few years, ripples in the supply chain affect the prices consumers pay at the pump or checkout line.  But healthcare is not like most—or really any—other industries.  For the vast majority of cases, healthcare facilities negotiate reimbursement rates (their primary source of revenue) well in advance with the handful of payers in the healthcare landscape—Medicare, Medi-Cal, and private insurance companies.  *See* Miller Decl. ¶ 23.  Facilities often wait *years* before any increases to Medicare or Medi-Cal standard charges.  *See id.* ¶ 25.  For instance, the last time Medi-Cal rates increased was nearly a *decade* ago.  *Id.*  Facilities typically negotiate contracts every two years, if not less frequently.  *See id.* ¶ 26.  When facilities seek changes, they must go through a lengthy negotiating process, which may or may not be successful in raising private reimbursement rates.  *Id.*

Many facilities with a high proportion of Medicare and Medi-Cal patients were already teetering on the brink before the Ordinance.  *See* Miller Decl. ¶ 24.  Medicare reimbursement rates, which are regulated and fixed by the Centers for Medicare and Medicaid Services ("CMS"), and Medi-Cal reimbursement rates, which are regulated by

the State of California, account for approximately 50% to 60% of most facilities' revenues, and some as high as 80%. *See id.* ¶ 24. But Medicare and Medi-Cal do not cover the actual cost of providing services. *Id.* ¶ 26. Nor do healthcare facilities necessarily make up the lost revenue by cost-shifting to private insurers. *Id.* Because private insurers do not want to absorb the increased costs, facilities instead often reduce operating expenses. *Id.* And even if a covered facility could shift *some* cost to private insurers, that process is bottled up with months of negotiations. *Id.* Covered facilities already have been operating at a deficit due to the COVID-19 pandemic even before the Ordinance goes into effect. *See id.* ¶ 30. All told, "California hospitals have collectively lost more than $20 billion since the beginning of the pandemic." *New Report: California Hospitals Face Massive Financial Losses Due to COVID-19 Pandemic; 2021 Shortfall Triple Previous Projections*, Cal. Hosp. Ass'n (Apr. 21, 2022), https://calhospital.org/new-report-california-hospitals-face-massive-financial-losses-due-to-covid-19-pandemic-2021-shortfall-triple-previous-projections/.

This dynamic spells trouble for covered facilities blindsided by an unexpected spike in labor costs. On one hand, the Ordinance law forbids facilities from absorbing the costs of the minimum wage hike by reducing premium pay, benefits, hours, or workforce size. Los Angeles Municipal Code § 187.52(C)(1)–(5). On the other hand, these same facilities have no practical ability to increase the revenue streams received from government and private payers in the foreseeable future. Facilities operating near (or even below) their margins will have no choice but to reduce services for patients because the Ordinance's effective date and restrictions hamstrings their ability both to increase revenues and to decrease labor costs. *See* Miller Decl. ¶ 27.

One thing is clear: No help will come from the Ordinance itself. The drafters were aware that the minimum wage increase could "cause reduction in employment or work hours for Healthcare Workers" in the worst possible way—by forcing struggling facilities out of business. Los Angeles Municipal Code § 187.57. In an effort to address this backfiring consequence, the Ordinance grants covered facilities the right to a one-

year waiver "if an Employer can demonstrate by substantial evidence that compliance with this article would raise substantial doubt about the Employer's ability to continue as a going concern under generally accepted accounting standards." *Id.* But if this waiver possibility seems like cause for optimism, the Ordinance crushes any hope in its next breath: Covered facilities "must" submit to "a court" "documentation of the Employer's financial condition, as well as the condition of any parent or affiliated entity, and evidence of the actual or potential direct financial impact of compliance with" the Ordinance. *Id.* The Ordinance is silent on the court procedure required to obtain the waiver, let alone on how a facility could both gather all this information and obtain a waiver by August 13 given the serious court backlogs plaguing the Los Angeles Superior Court. Miller Decl. ¶ 38.

Defendants City of Los Angeles, Office of Wage Standards, and Mayor Garcetti are the public officials empowered to enforce the Ordinance. *See* Los Angeles Municipal Code § 187.54 (citing *id.* §§ 188.05–.11). Once the law takes effect, "any suspected violation" of the Ordinance can be reported to OWS. *Id.* § 188.05(A). And employees, the City Attorney, and "any other person or entity acting on behalf of the public" has a private right of action to sue covered employers. *Id.* § 188.07(B). These penalties can multiply quickly, with penalties ranging from upwards of $50 to $120 per employee per day of a violation, in addition to any other claimed employment violations. *See id.* §§ 188.07(B), 188.08(A).

## III.  Dire Circumstances Bring Plaintiffs to Court

The Ordinance's fragmentary coverage subjects healthcare facilities and workers to constitutionally impermissible unequal treatment. In doing so, the Ordinance exposes facilities to substantial financial distress while pulling the rug out from underneath them in the waiver process by imposing procedures that are impractical to satisfy by its effective date.

Plaintiff Barlow Respiratory Hospital is a case in point. Barlow stands among the national leaders in weaning chronically critically ill patients from mechanical

ventilation.  Declaration of Amit Mohan ("Mohan Decl.") ¶ 2.  Its main campus is in downtown Los Angeles, with one satellite campus inside the City (Van Nuys) and one outside (Whittier).  *Id.* ¶ 3.  Patients come from across California to receive care from Barlow's interdisciplinary teams of physicians, registered nurses, and therapists, who all pride themselves on discharging their patients to their homes or to lower levels of care. *Id.* ¶ 2.  Since the onset of the COVID-19 pandemic, however, Barlow has operated at 50% to 80% of pre-pandemic level.  *Id.* ¶ 6.  Its year to-date margin is currently around –10%, an approximate loss of $500,000 per month.  *Id.*  And its labor costs were already 66% of hospital expenditures.  *Id.* ¶ 7.  If forced to comply with the Ordinance, Barlow "expects to close at least [its] downtown location and possibly all three locations" as "the cost of increased wages will put [it] too far into an unsustainable condition."  *Id.* ¶¶ 7–8.  Barlow would like to try to stave off this catastrophe for its patients by seeking the Ordinance's one-year waiver.  *Id.* ¶ 9.  But there "is no way for Barlow to compile the necessary evidence and audit opinion and obtain the necessary court order" before the effective date.  *Id.*  Barlow is a small operation with just 380 employees, and "does not house a payroll department, attorney, or even a dedicated payroll specialist."  *Id.* ¶ 4.

PIH Health Good Samaritan Hospital is in a similar, albeit not as terminal, position.  Founded in 1885, Good Samaritan is the oldest hospital in Los Angeles. Declaration of James West ("West Decl.") ¶ 3.  Its centuries-long mission has been to put patients first, no matter their financial status.  *Id.*  Reflecting this cornerstone commitment, the vast majority of its patients are indigent or covered by Medicare or Medi-Cal, which accounts for over 60% of its revenues.  *Id.* ¶ 5.  Now factor into this mix that labor costs account for 54% of Good Samaritan's hospital expenses.  If the Ordinance goes into effect, Good Samaritan will not be able "to raise the revenue in order to offset the increased labor costs" and worries that the strain "will negatively impact the entire PIH Health system."  *Id.* ¶ 7.

Plaintiff Providence Holy Cross Medical Center operates a not-for-profit facility with a range of in-patient and out-patient services, including a Level II trauma center.

Gibson, Dunn & Crutcher LLP

Declaration of Dr. Bernie Klein ("Klein Decl.") ¶ 4.  Holy Cross spends approximately 50% of its costs on labor.  *Id.*  Holy Cross serves some of the most vulnerable members in the City, with 31% of its patients currently on Medi-Cal, 32% of its patients on Medicare, and only 1.2% self-paying.  *Id.* ¶ 5.  If the ordinance goes into effect on August 13, Holy Cross believes "it would be extremely challenging to implement, if not impossible" to comply, because of the uncertainty of which workers it applies to and the "logistical nightmare" of implementing such sweeping changes so quickly.  *Id.* ¶ 9.  And while "Holy Cross would want to obtain the one-year waiver contemplated under the Ordinance," it does not have sufficient time to determine whether it qualifies and obtain the necessary court order before the Ordinance goes into effect.  *Id.* ¶ 11.

Plaintiffs Hospital Association of Southern California (HASC) and California Hospital Association (CHA) are not-for-profit associations of public and private hospitals.  Because they have many members in the same boat as the individual Plaintiffs, HASC and CHA have stepped in to represent the interests of their members. Two of their members, Gateways Hospital and Mental Health Center and Mission Community Hospital, are extremely concerned about the implications of the Ordinance on their patients.  So much so that they have submitted declarations in support of this motion even though they are not parties to the lawsuit.

Gateways is a provider of acute behavioral health services, including for children who must be involuntarily hospitalized.  Declaration of Phil Wong ("Wong Decl.") ¶¶ 2–3.  A significant proportion of the adult and child population that needs its roughly 300 beds are either homeless or at risk of becoming homeless, and have often been involved with the legal/justice system.  *Id.*  Inpatients are mostly referred by Los Angeles County psychiatric emergency rooms and are brought to the facility by ambulance.  *Id.* ¶ 4. Nearly all of Gateways's revenue is essentially fixed by government sources, and its year-to-date margin is currently around 0 to 1%. *Id.* ¶ 6.  If Gateways is forced to comply with the Ordinance on August 13, it "may have no option but to scale back operations by approximately 20%," which "will have a significant impact on the services it provides

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1   and approximately 100 employees may lose their jobs." *Id.* ¶ 7.  Gateways would seek

2   a one-year waiver to stave off these "draconian measures," but it cannot compile the

3   necessary evidence and audit opinion, and obtain a court order in a month. *Id.* ¶ 11.

4          Mission Community Hospital is in a similar position.  It too serves some of the

5   City's most vulnerable communities, and fears it will be forced to significantly reduce

6   its services.  Declaration of James K. Theiring ("Theiring Decl.") ¶¶ 3, 7.  Mission

7   Community is in a precarious financial position because "it increased the number of

8   COVID-19 patient[s] it could treat exponentially," which meant it had to "suspend[]

9   most of its other hospital programs." *Id.* ¶ 5.  Like Gateways, Mission Community

10  believes it could qualify for and benefit from the one-year exception, yet it is impossible

11  to meet the requirements in under a month. *Id.* ¶ 10.

12         Stuck in this bind, Plaintiffs filed this action on behalf of themselves and their

13  members to raise their serious concerns about the disparate treatment of the coverage

14  classification and the impossible timeline of the effective date and judicial waiver

15  process. *See* Compl., Dkt. 1.  They now request a preliminary injunction.  Without some

16  breathing room against near-immediate enforcement of the challenged Ordinance, they

17  fear substantial and irreversible harm before this Court has an opportunity to adjudicate

18  their claims under the Equal Protection Clause and Due Process Clause.  Plaintiffs have

19  also concurrently filed an *ex parte* motion to expedite the briefing schedule and hearing

20  date to provide adequate time for the Court to consider and, if appropriate, issue a

21  preliminary injunction before the Ordinance takes effect on August 13.

22                                  **LEGAL STANDARD**

23         "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to

24  succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

25  preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

26  injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

27  20 (2008).  The Ninth Circuit applies these factors using a "sliding scale" approach,

28  which is also called the "serious questions" test. *All. for the Wild Rockies v. Cottrell*,

632 F.3d 1127, 1131–35 (9th Cir. 2011).  Under this approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Id.* at 1131; *see Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

Where "the balance of hardships tips sharply in the plaintiff's favor," the Court may issue a preliminary injunction where "there are serious questions going to the merits—a lesser showing than likelihood of success on the merits." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2011) (cleaned up).  "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quotation marks omitted).

## ARGUMENT

This case cries out for preliminary injunctive relief.  The City has adopted a minimum wage increase with a peculiar—and unconstitutional—coverage classification that treats similarly situated facilities differently, leaves more than half of the City's healthcare workers uncovered, threatens struggling covered facilities with closure, and exacerbates retention issues at non-covered facilities.  If picking winners and losers were not bad enough, the City also set a mere 31-day window to come into compliance with an unprecedented 55% minimum wage increase despite the fact that the government prescribes (or, for private insurance, facilities negotiate) their revenue streams months or years in advance.  The Ordinance purported to establish a waiver process, implicitly recognizing that the sudden 55% increase in the minimum wage could cause covered employers to cease being a "going concern," as well as medical catastrophes.  But the evidentiary requirements, abbreviated period to obtain such a waiver, absence of any procedural guidance as to how to obtain that waiver, and judicial backlogs make the waiver process well-nigh impossible to use before the Ordinance goes into effect.

Plaintiffs have raised concerns about the Ordinance that are worth taking seriously on the merits.  And they do not ask for much in this motion—just temporary interim

Gibson, Dunn & Crutcher LLP

relief abating the irreversible consequences of a drastic departure from the status quo as the parties promptly proceed to final judgment, even if that relief lasts only a few months. Meanwhile, the City's interest in racing to implement a law that is shrouded in constitutional uncertainty pales in comparison to the public's paramount interest in avoiding disarray and dysfunction in the healthcare industry. This Court should issue a preliminary injunction enjoining the enforcement of the Ordinance.

## I.   Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on their claims that the Ordinance violates the Equal Protection and Due Process Clauses of the U.S. and California Constitutions. At any rate, they have raised serious questions about the constitutionality of the Ordinance.

### A.   The Ordinance's Irrational Linedrawing Between Covered and Non-Covered Facilities Violates the Equal Protection Clause.

The United States and California Constitutions each require California to provide the "equal protection of the laws" to persons within its jurisdiction. U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7(a). This guarantee is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

This constitutional principle of equal treatment forbids classifications that include or exclude similarly situated persons without adequate justification. In doctrinal parlance, no law may draw classifications that do not "rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). This standard, though deferential, is not toothless. Courts must "conduct a serious and genuine inquiry into the correspondence between the classification and the legislative goals." *Hays v. Wood*, 25 Cal. 3d 772, 786–87 (1979) (quotation marks omitted). While a challenged law "need not provide a perfectly logical[] solution to a regulatory problem," the law still "cannot hope to survive *rational* basis review by resorting to irrationality." *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) (italics in original).

The Ordinance provides that private acute care and psychiatric hospitals, clinics

13

affiliated with such hospitals, and dialysis clinics regardless of their affiliation must come into near-immediate compliance with a 55% increase in the minimum wage for a substantial number of their workers—from nursing aides to janitors to groundskeepers to kitchen staff.   Los Angeles Municipal Code § 187.51(B)(1)–(7).   Under this gerrymandered definition, *more than half* of healthcare workers in Los Angeles work for uncovered facilities, such as public hospitals, clinics affiliated with such hospitals, community health clinics, federally qualified healthcare clinics, and family planning clinics. *See* Miller Decl. ¶ 9.

The question thus is whether the choice to cover certain facilities and to exclude other facilities is "rationally related to a legitimate government interest." *Fowler Packing Co. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016).  Here, the Ordinance labels the selective minimum wage increase as a "solution" to three problems: (1) the rising cost of living that destabilizes "the incomes of healthcare workers who are low-wage earners"; (2) "staffing shortages that could jeopardize the availability of care in Los Angeles, especially in our most vulnerable communities"; and (3) "increasing profit margins" of hospital systems that should be used "to fairly compensate" workers.  Los Angeles Municipal Code § 187.50.  Not one of these objectives can rationally justify the Ordinance's coverage definition.  To the contrary, the classification of covered facilities is divorced from, and defeats, any conceivable government interest.

### 1. The Coverage Definition Targets the Alleged Problem Where It Is Least Prevalent.

The Ordinance did not take an even-handed approach of raising the minimum wage for all healthcare workers.  Nor did the Ordinance take the incremental approach of targeting low wages where they are most prevalent.  Eschewing both approaches, the Ordinance went in the *opposite* direction by exempting a *majority* of the City's healthcare workers from the minimum wage hike.  *See* Miller Decl. ¶ 9.  There is no good reason for treating differently two employees who do the same exact job, one at a covered facility and another at a non-covered facility.  The purpose of raising wages to

match cost-of-living increases cannot explain the City's decision to exclude non-covered workers, who are identical in all respects to covered workers except for the happenstance of their employers' identity. *See* Los Angeles Municipal Code § 187.51(B), (G). In fact, non-covered facilities have a higher proportion of workers earning less than $25 per hour (39%) than do covered facilities (35%). Miller Decl. ¶ 9.

Plaintiffs therefore are likely to prevail under the Equal Protection Clause because the Ordinance irrationally "singles out" facilities that are less likely to contribute to the risk to "public welfare"—worker burnout, retention challenges, and staffing shortages—allegedly caused by wages below $25 per hour. *Merrifield*, 547 F.3d at 991–92. In other words, there is no reason to start with covered facilities when non-covered facilities contribute *more* to the purported problem. Contrast the law here with the pushcart ban upheld in *New Orleans v. Dukes*, 427 U.S. 297 (1976). There, the Supreme Court approved a grandfather clause, noting that the exemption protected "substantial reliance interests" and preserved older pushcart businesses that had "become part of the distinctive character and charm" of the neighborhood. *Id.* at 305. The law thus had a reason to exempt the businesses that did *less* to harm the City's objective of improving "the economic vitality" of the French Quarter. *Id.* at 304–05. No such justification exists here—just the picking of economic winners and losers. *See Merrifield*, 547 F.3d at 991 n.15 (citing *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002)).

Worse, the justification for this line drawing—to the extent one exists—is not a legitimate one. Consider, for example, that dialysis clinics are apparently included only because of the initiative proponent's fixation on such clinics after failed attempts to unionize them.[7] But the Ninth Circuit has held that laws may not draw lines for no reason

---

[7] Victoria Colliver, *Inside a California Health Care Union's Obsession with Kidney Dialysis Initiatives*, Politico (Nov. 19, 2021), https://www.politico.com/states/california/story/2021/11/19/inside-a-california-health-care-unions-obsession-with-kidney-dialysis-initiatives-1394715; Lauren Rosenhall, *Good Policy or Ballot Blackmail? Union Keeps Taking Its Fights with Health Industry to Voters*, Cal Matters (Oct. 20, 2020), https://calmatters.org/politics/california-election-2020/2020/10/california-healthcare-union-proposition-23/.

Gibson, Dunn & Crutcher LLP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

"other than to respond to the demands of a political constituent." *Fowler Packing*, 844 F.3d at 815.  For good reason: "'nothing opens the door to arbitrary action so effectively as to allow [government] officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.'"  *Hays*, 25 Cal. 3d at 787 (quoting *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112–13 (1949) (Jackson, J., concurring)).

The Ordinance defies the command of the Equal Protection Clause to "include within its sanction all who come within its purpose and scope."  *Ex parte Scaranino*, 7 Cal. 2d 309, 312 (1936).  Whatever nominal differences may exist between covered and non-covered facilities, the Ordinance's "discrimination" against the former but not the latter "has no reasonable relation to these differences."  *Hartford Steam Boiler Inspection & Ins. Co. v. Harrison*, 301 U.S. 459, 463 (1937); *see also O'Neal v. City of Seattle*, 66 F.3d 1064, 1068 (9th Cir. 1995) (holding that government's chosen line drawing was "illogical" and not "rationally related to the City's interest").

### 2.   The Coverage Definition Exacerbates, Rather than Eliminates, Staffing Shortages.

Plaintiffs are likely to prevail on their equal protection claim for a second, independent reason:  the Ordinance's irrational line drawing undermines its own stated goals.  *See Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1065 (9th Cir. 2018) (noting that a law supported by a "contradictory" rationale fails the rational basis test). The stated purpose of the minimum wage increase is to improve worker retention.  But the Ordinance undermines this objective through its irrational exclusion of non-covered facilities and workers.

The increased minimum wage will have little (if any) effect on turnover at covered facilities because "safety concerns and unprecedented pressures associated with the COVID-19 pandemic" have already caused high turnover among workers regardless of compensation level. Miller Decl. ¶ 17.  Compensation is one aspect of an employee's view of their job but non-wage incentives including vacation, part-time work, flexibility

in working conditions, schedules, and telework are important to help retain workers, particularly given the effects of the COVID-19 pandemic on the employer-employee relationship. *Id.*

And by setting up an arbitrary distinction between covered and non-covered facilities, the Ordinance will only increase the overall amount of turnover as non-covered workers look to jump to covered facilities experiencing their own staffing shortages for a higher guaranteed wage. This vicious cycle presents non-covered facilities with an impossible choice—match the wage raise (something many struggling facilities cannot do) or lose employees to covered facilities. At particular risk are non-covered community clinics, such as federally qualified health centers (known as FQHCs). Already grappling with "costs increasing faster than revenues," FQHCs will not be able to raise wages given their heavy reliance on Medicare and Medi-Cal programs. Miller Decl. ¶ 18.

Because the Ordinance counterproductively *increases* turnover at non-covered facilities, Plaintiffs are likely to prevail on their claim that the coverage classification violates the Equal Protection Clause. The Ninth Circuit's analysis in *Merrifield* illustrates why. There, the plaintiff challenged a law requiring persons engaged in pest control to procure a license to use pesticides, whether or not the person actually employed pesticide in their business. 547 F.3d at 980. The government justified this licensing scheme based on the "possibility" that pest controllers "might interact with pesticide." *Id.* at 991. The law, however, had an exemption for persons who controlled bats, raccoons, skunks, and squirrels—but *not* mice, rats, or pigeons. *Id.* at 982. So if a pest controller focused on skunks, he didn't need a license, but a controller *did* need one if he focused on rats. This classification flunked rational basis review because its line drawing had it backwards: those exempted were the very ones who were "*most likely* to interact with pesticides." *Id.* at 992 (emphasis added). So too here, the government "undercut its own rational basis for [its classification] scheme" by adopting a coverage definition that *increases* turnover at non-covered facilities, which are the majority of

17

facilities in Los Angeles.  *Id.* at 991–92; *see Walgreen Co. v. City and County of San Francisco*, 185 Cal. App. 4th 424, 439 (2010) (holding that "a law that discriminates among similarly situated persons based upon [a] questionable or speculative premise may well lack a rational basis to support the unequal treatment").

### 3.    The Coverage Definition Has No Rational Tie to Profits.

The Ordinance also included the finding that "hospital systems made huge profits in the billions of dollars during the pandemic, with increasing profit margins."  Los Angeles Municipal Code § 187.50.  Whatever value this line might have as a political talking point, this patently false assertion bears no rational relationship to the coverage definition.  A classification always must rest on "some plausible reason, based on reasonably conceivable facts."  *Walgreen*, 185 Cal. App. 4th at 442.  But these "hypothesized facts" are pure "fantasy."  *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

As mentioned above, "California hospitals have collectively lost more than $20 billion since the beginning of the pandemic."  *New Report: California Hospitals Face Massive Financial Losses Due to COVID-19 Pandemic; 2021 Shortfall Triple Previous Projections*, *supra*.  Barlow, for example, has been operating in the red all year, losing $500,000 *a month*.  Mohan Decl. ¶ 6.  And it is not alone.  The year-to-date margin at Gateways is currently between 0 and 1%.  Wong Decl. ¶ 6.  In fact, HASC estimates that 25% to 35% of its covered members—many of whom are located within the City of Los Angeles—"may have an extremely difficult time complying with this Ordinance either because of the inability to pay the higher wages, because of the short timeline to implement the changes (just 31 days), or more commonly both."  Green Decl. ¶ 7.   If the Ordinance really meant to target healthcare facilities that made large profits, its means were completely irrational.

### 4.    The Ordinance Breaks with the Justification for Past Targeted Minimum Wages.

In the past, municipalities have imposed increased minimum wage requirements

18

on "businesses receiving municipal investments." *Garcia v. Four Points Sheraton LAX*, 188 Cal. App. 4th 364, 383 (2010). The California Court of Appeal, for example, upheld a minimum wage increase targeted to LAX-area hotels that benefited from the City's designated business zone. *Id.* at 383–84; *see also Fortuna Enter., L.P. v. City of Los Angeles*, 673 F. Supp. 2d 1000, 1014 (C.D. Cal. 2008). The Ninth Circuit likewise sustained a minimum wage ordinance limited to employers who leased marina property from the City of Berkeley, noting that the leaseholders benefited "in the form of improvements and lack of competition due to [a] development moratorium." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1156 (9th Cir. 2004). Here, however, covered facilities do not use City property or receive special City benefits in exchange for this disparate treatment relative to non-covered facilities. There is simply no way to justify—at least with a rational reason—the Ordinance's distinction between covered and non-covered facilities.

### B.   The Ordinance's Inadequate Notice and Waiver Process Deprives Plaintiffs of Procedural Due Process.

Plaintiffs are also likely to succeed on their procedural due process claims. The Due Process Clauses of the United States and California Constitutions both forbid the government to "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7. To invoke the federal version, a person must show the "deprivation of a constitutionally protected liberty." *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998)). The California version, however, provides that "an aggrieved party need not establish a protected property interest," but can instead rely on "a statutorily conferred benefit or interest of which he or she has been deprived to trigger procedural due process." *Ryan v. Cal. Interscholastic Federation-San Diego Section*, 94 Cal. App. 4th 1048, 1071 (2002). Thus, the California Constitution provides even greater protections to assure that any deprivation of any protected interest take place only "in a nonarbitrary,

19

nondiscriminatory fashion." *Saleeby v. State Bar*, 39 Cal. 3d 547, 565 (1985); *see also Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1050 (9th Cir. 2014) (recognizing that "California's due process protections are, at times, broader than those imposed by the Fourteenth Amendment").

Procedural due process claims require an examination of (1) the significance of the "private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *see also Saleeby*, 39 Cal. 3d at 565. Plaintiffs are likely to prevail on each element because the notice and waiver provisions of the Ordinance deprive Plaintiffs and their members of both protected property interests and the statutory waiver right purportedly afforded by the Ordinance.

### 1. The Ordinance Deprives Plaintiffs of Weighty Interests Protected by the U.S. and California Constitutions.

The enforcement of the Ordinance would deprive Plaintiffs of property interests. If Plaintiffs are unable to implement the Ordinance on its abbreviated timeline, Defendants can punish violations of the Ordinance with monetary penalties. *See Los Angeles Municipal Code* §§ 188.07(B), 188.08(A). The Ordinance's severe 55% increase in the minimum wage also threatens Plaintiffs with the prospect of going out of business. *See, e.g.*, Mohan Decl. ¶ 7. Their medical practice, including the revenue received from patients, private insurers, Medicare, and Medi-Cal, is a property interest. *See Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 751 (N.D. Tex. 2019); *see also, e.g.*, *Ong v. Tovey*, 552 F.2d 305, 307 (9th Cir. 1977) (surgical residency).

Plaintiffs also have a protected interest under California law because the Ordinance's waiver process constitutes a "statutorily conferred benefit[]," required to "trigger" protections under the California Constitution. *Ryan*, 94 Cal. App. 4th at 1071.

The Ordinance confers a benefit by granting a one-year reprieve to employers who can show a "substantial doubt" regarding their "ability to continue as a going concern." Los Angeles Municipal Code § 187.57.

### 2.    The Ordinance Sets an Infeasible Effective Date and Provides an Inadequate Waiver Procedure.

*Whiplash Implementation Period*. The Ordinance's effective date deprived covered facilities of the adequate notice needed to give them "a reasonable opportunity to discern whether their conduct is proscribed so they can choose whether or not to comply with the law." *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000). The problems with this implementation procedure are both legal and practical. On the legal side, the Ordinance covers nonsensical or ambiguous worker categories like "professional," "non-professional," and "aide." Los Angeles Municipal Code § 187.51(G). Before the City Council took its final vote on June 29, CHA even sought clarification regarding the perplexing terms of the Ordinance, but to no avail. *See* Dkt. 1-6; Hiltachk Decl. ¶ 7. On the practical side, facilities negotiate reimbursement rates with payers well in advance and cannot adjust on a short time period. *See* Miller ¶ 26. Sometimes the legal and practical meld, as for the inclusion of workers who "work at or by" a covered facility. Los Angeles Municipal Code § 187.51(G). Facilities like Barlow do not understand how the Ordinance applies to employers with facilities both inside and outside City borders. Mohan Decl. ¶ 8; *see also* Miller Decl. ¶ 10. While the Office of Wage Standards may be able to issue administrative guidance resolving these questions, *see* Los Angeles Municipal Code § 187.54(B), no such guidance exists now or likely will by August 13. The effective date will deprive Plaintiffs of their property and statutory interests even though "additional or substitute procedural safeguards," such as additional compliance time, would lower "the risk of an erroneous deprivation." *Mathews*, 424 U.S. at 335.

*Unworkable Waiver Process.* The Ordinance recognized that the minimum wage increase could force healthcare facilities operating at the margins to shut their doors to

their employees and patients.  As a safety valve, the Ordinance purports to offer a meager one-year reprieve for facilities that can show a "substantial doubt" regarding their "ability to continue as a going concern."  Los Angeles Municipal Code § 187.57.  But the Ordinance extends the prospect of a waiver just to snatch this statutory benefit away with procedures that are impossible to satisfy under the 31-day timeline.  Facilities have no way to (1) gather "evidence of the actual or potential direct financial impact of compliance" and (2) then receive a determination from the heavily backlogged Los Angeles Superior Court before the Ordinance takes effect on August 13.  *Id.*  These procedures create a ***100%*** failure rate—every facility entitled to a waiver has no practical way of getting one.  *See* Miller Decl. ¶¶ 34–36; Mohan Decl. ¶ 10; Wong Decl. ¶ 11; Klein Decl. ¶ 11; West Decl. ¶ 10; Theiring Decl. ¶ 9; *see also Mathews*, 424 U.S. at 344 (noting that "procedural due process rules are shaped by the risk of error . . . as applied to the generality of cases").

### 3.   The City Has No Interest In Rushing the Implementation of the Ordinance or Establishing a Futile Waiver Process.

The City has little interest in prescribing such a short implementation period. While the City may want to increase wages for covered workers, it has no justification for doing that in such a rushed manner that it causes healthcare facilities to close, workers to lose their jobs, and patients within the City to suffer.  *See* Miller Decl. ¶¶ 41–42; *see also* Mohan Decl. ¶ 7–8.

Nor does the City have any valid interest in holding out the false promise of a waiver.  The City could have implemented prompt administrative procedures or could have delayed implementation of the minimum wage to provide adequate time for judicial review of waiver requests.  For example, past industry-targeted ordinances have allowed the City Controller to issue waivers. *See, e.g.*, *Fortuna*, 673 F. Supp. 2d at 1003.  Indeed, targeted wage ordinances that have survived constitutional challenge have set forth far clearer procedures that can actually be accomplished within a reasonable amount of time.  For example, the Citywide Hotel Worker Minimum Wage Ordinance allows a

22

1    one-year waiver if the hotel employer can demonstrate by "compelling evidence" that

2    the hotel employer would be forced to reduce its workforce by more than 20 percent or

3    curtail its workers total hours by more than 30 percent in order to avoid a bankruptcy or

4    shutdown.  Los Angeles Municipal Code § 186.09.  The provision sets forth an appeal

5    process to the City Council that prescribes time limitations and potential auditing

6    conditions.  *Id.*   The City knows how to put together a meaningful one-year waiver

7    process when it elects to do so.  It did not do so here, and should not be permitted to strip

8    facilities of their medical practices even when a waiver should exist in theory.  Yet that

9    is exactly what the Ordinance does.

10   **II.     The Unconstitutional Ordinance Will Cause Plaintiffs Irreparable Harm**

11           Plaintiffs will suffer irreparable harm absent a preliminary injunction.  The denial

12   of equal protection and due process itself meets this factor because even "an *alleged*

13   constitutional infringement will often alone constitute irreparable harm."  *Monterey*

14   *Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (emphasis added); *see also*

15   *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding irreparable

16   harm from the dilemma of either "continually violat[ing] [state] law and expos[ing]

17   [oneself] to potentially huge liability; or . . . suffer[ing] the injury of obeying the law

18   during the pendency of the proceedings and any further review").  Additionally, a

19   "constitutional violation alone, coupled with the damages incurred, can suffice to show

20   irreparable harm," because "'constitutional violations cannot be adequately remedied

21   through damages.'"  *Am. Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046,

22   1058–59 (2009) (quoting *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008)).

23           Although a constitutional violation itself is an irreparable harm, the Ordinance

24   stands poised to wreak much more havoc in the absence of a preliminary injunction.

25   Barlow will be forced to close at least some, if not all, of its facilities, having already

26   been pushed to the brink by pandemic-related losses.  Mohan Decl. ¶¶ 7–8.  Many

27   healthcare facilities—including members of Plaintiffs HASC and CHA—are operating

28   at razor-thin margins and risk closing their doors to both their workers and their patients.

*See* Miller Decl. ¶¶ 27–28.  Both Gateways and Mission Community fear they may be forced to dramatically reduce services, thereby harming those most vulnerable including children involuntarily hospitalized for acute mental health conditions.  Wong Decl. ¶¶ 2–3, 7; Theiring Decl. ¶¶ 3, 7.

For an Ordinance whose purported aims are improving workforce retention and ensuring "the availability of care in Los Angeles, especially in our most vulnerable communities," its effects are deeply perverse.  Los Angeles Municipal Code § 187.50.  And they are irreparable, for facilities that close and services that disappear will not be able to spring back open if and when Plaintiffs prevail at final judgment.  *See Nelson*, 530 F.3d at 882 ("the loss of one's [business] does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of [losses]"); *Ajilon Pro. Staffing, LLC v. Griffin*, 2009 WL 976522, at *3 (D. Ariz. Apr. 10, 2009) ("It is well-settled that injury to or destruction of a business constitutes irreparable harm for which preliminary and permanent injunctive relief may be appropriate.").

The irreparable harm is not limited to those facilities that shut their doors or materially limit their services.  Once wages go up to $25 per hour, covered facilities will be unable to return to pre-Ordinance wage levels without irreversibly damaging the employer-employee relationship and causing increased staffing shortages.  *See* Miller Decl. ¶¶ 39–40.  Said otherwise, an employer cannot lower wages as a practical matter just because an unconstitutional mandatory wage increase is later invalidated.  The increase of wages below $25 per hour also puts upward pressure on the wages of workers currently earning above that line.  *See id.* ¶ 22.  Without injunctive relief stopping this train from leaving the station, Plaintiffs will have little hope of effective relief if they ultimately prevail on their claims.

## III.   The Balance of Equities and Public Interest Tip Sharply in Plaintiffs' Favor

The balance of equities and the public interest favor injunctive relief before the City's enforcement of the unconstitutional Ordinance can inflict irreparable harm on

Plaintiffs. Where, as here, the government is a party, these two factors "merge" together. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014); *see Nken v. Holder*, 556 U.S. 418, 435 (2009). But even considered separately, both decisively weigh on Plaintiffs' side of the ledger.

To start, "the balance of the equities favor preventing the violation of a party's constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). That is to say that "the city has no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Nor would the City suffer irreparable harm from delay, even assuming it could prevail at the end of the day. The injunction would not need to be in effect for long because Plaintiffs' constitutional claims call for legal determinations that will require only limited factual development. Both Plaintiffs and the City could have a final judgment in hand within six months to a year—which is not too much to ask before the City begins picking and choosing winners among healthcare facilities and workers through an (at best) unusual and (at worst) unconstitutional coverage classification.

Next, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Seen from the other direction, "[t]he public has no interest in enforcing an unconstitutional ordinance." *KH Outdoor*, 458 F.3d at 1272. Nor does the public have an interest in facilities rolling back services to patients as a way to save money to comply with the Ordinance. *See* Miller Decl. ¶¶ 19, 27, 42; *see also Med-Cert Home Care*, 365 F. Supp. 3d at 758. The public deserves certainty that the harmful and irreversible destabilization of the healthcare system in Los Angeles is merely unwise, rather than unconstitutional.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin Defendants from enforcing or causing to be enforced the Ordinance against them or their members, pending final judgment.

1   Dated:  July 15, 2022               Respectfully submitted,

2

3                                 GIBSON, DUNN & CRUTCHER LLP

4

5                                 By:        */s/ Maurice Suh*
6                                          Maurice Suh

7

8                                 Attorneys for Plaintiff California Hospital
Association

9

10                                BELL, MCANDREWS & HILTACHK, LLP

11

12                              By:      */s/ Thomas W. Hiltachk*
13                                     Thomas W. Hiltachk

14

15                                Attorneys for Plaintiffs Barlow Respiratory
Hospital; PIH Health Good Samaritan Hospital;
16                                Providence Holy Cross Medical Center;
Hospital Association of Southern California

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

## **ECF ATTESTATION**

I, Maurice Suh, hereby attest pursuant to Local Rule 5-4.3.4(a)(2) that the concurrence in the filing of this document has been obtained by the above signatories.

Dated: July 15, 2022

                                                            */s/ Maurice Suh*
                                                            Maurice Suh

Gibson, Dunn & Crutcher LLP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION