1   GIBSON, DUNN & CRUTCHER LLP
    MAURICE SUH, SBN 147485
2     msuh@gibsondunn.com
    JEREMY S. SMITH, SBN 283812
3     jssmith@gibsondunn.com
    ANDREW M. KASABIAN, SBN 313210
4     akasabian@gibsondunn.com
    PATRICK J. FUSTER, SBN 326789
5     pfuster@gibsondunn.com
    333 South Grand Avenue
6   Los Angeles, CA  90071-3197
    Telephone:  213.229.7000
7   Facsimile:   213.229.7520

8   BELL, MCANDREWS & HILTACHK LLP
    THOMAS W. HILTACHK, SBN 131215
9     tomh@bmhlaw.com
    BRIAN T. HILDRETH, SBN 214131
10    bhildreth@bmhlaw.com
    PAUL T. GOUGH, SBN 75502
11    pgough@bmhlaw.com
    455 Capitol Mall, Suite 600
12  Sacramento, CA 95814
    Telephone:  916.442.7757
13  Facsimile:   916.442.7759

14  Attorneys for Plaintiffs

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17  BARLOW RESPIRATORY              CASE NO. 2:22-CV-04828-JLS-GJS
    HOSPITAL; PIH HEALTH GOOD
18  SAMARITAN HOSPITAL;             **REPLY IN SUPPORT OF**
    PROVIDENCE HOLY CROSS           **PLAINTIFFS' MOTION FOR**
19  MEDICAL CENTER; HOSPITAL        **PRELIMINARY INJUNCTION**
    ASSOCIATION OF SOUTHERN
20  CALIFORNIA, an Incorporated     **[Fed. R. Civ. P. 65]**
    California Nonprofit Membership
21  Association; and CALIFORNIA     Hearing Date:   August 5, 2022
    HOSPITAL ASSOCIATION, an        Time:           10:30 a.m.
22  Incorporated California Nonprofit   Place:          Courtroom 8A
    Membership Association,          Judge:          Hon. Josephine L. Staton
23
                    Plaintiffs,
24
          v.
25
    CITY OF LOS ANGELES; OFFICE
26  OF WAGE STANDARDS FOR THE
    CITY OF LOS ANGELES; ERIC
27  GARCETTI, in his official capacity as
    Mayor of Los Angeles; and DOES 1-20,
28
                    Defendants.

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 3

   I.    Plaintiffs Are Likely to Succeed on the Merits ............................................. 3

        A.   The Coverage Definition Violates the Equal Protection Clause ............... 4

             1.   The Coverage Definition Does Not Reward Healthcare Workers at Non-Covered Facilities. ..................................................... 5

             2.   The Coverage Definition Adopts an Upside-Down Approach. .......... 6

             3.   The Coverage Definition Contains Irrational Private-Private Distinctions. ...................................................................................... 6

             4.   The Coverage Definition Exacerbates Turnover at Non-Covered Facilities. .................................................................................. 9

             5.   The Coverage Definition Does Not Track Profits ........................... 11

             6.   The Coverage Definition Does Not Increase Wages in Exchange for Public Benefit. ............................................................. 12

        B.   The Ordinance Deprives Plaintiffs of Procedural Due Process. .............. 13

             1.   The Implementation Period Deprives Plaintiffs of a Reasonable Opportunity to Comply with the Ordinance. .................................. 13

             2.   The Waiver Process Is Illusory. ....................................................... 15

   II.   Plaintiffs Have Shown Likely Irreparable Harm from the Unconstitutional Ordinance ....................................................................... 17

   III.  The Balance of Equities and Public Interest Sharply Favor a Preliminary Injunction ............................................................................... 21

CONCLUSION ...................................................................................................... 22

Gibson, Dunn & Crutcher LLP

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .................................................................... 4

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) .................................................................. 17

*Am. Soc'y of Journalists & Authors, Inc. v. Bonta*,
15 F.4th 954 (9th Cir. 2021) ................................................................. 6, 11

*Am. Trucking Ass'ns Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) .................................................................. 19

*Angelotti Chiropractic v. Baker*,
791 F.3d 1075 (9th Cir. 2015) ............................................................... 5, 6

*Arc of California v. Douglas*,
757 F.3d 975 (9th Cir. 2014) .................................................................... 18

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) .................................................................... 21

*Ashaheed v. Currington*,
7 F.4th 1236 (10th Cir. 2021) .................................................................... 8

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) .................................................................................. 14

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) .................................................................. 20

*Cal. Grocers Ass'n v. City of Long Beach*,
521 F. Supp. 3d 902 (C.D. Cal. 2021) ..................................................... 12

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .................................................................... 20

*Carney v. Adams*,
141 S. Ct. 493 (2020) ................................................................................ 17

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)..................................................................................... 4

*Clark v. City of Seattle*,
   899 F.3d 802 (9th Cir. 2018) ...................................................................... 17

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)................................................................................ 20

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) .................................................................... 21

*Forbes v. Napolitano*,
   236 F.3d 1009 (9th Cir. 2000) .................................................................... 13

*Fowler Packing Co. v. Lanier*,
   844 F.3d 809 (9th Cir. 2016) ........................................................................ 9

*Goldberg v. Kelly*,
   397 U.S. 254 (1970).................................................................................... 14

*Gratz v. Bollinger*,
   539 U.S. 244 (2003).................................................................................... 17

*Halverson v. Skagit Cnty.*,
   42 F.3d 1257 (9th Cir. 1994) ...................................................................... 14

*Hartford Steam Boiler Inspection & Ins. Co. v. Harrison*,
   301 U.S. 459 (1937)...................................................................................... 8

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) .................................................................... 18

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) ........................................................................ 18

*Mathews v. Eldridge*,
   424 U.S. 319 (1976).................................................................................... 13

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ...................................................................... 21

*Merrifield v. Lockyer*,
   547 F.3d 978 (9th Cir. 2008) ................................................................. 6, 11

Gibson, Dunn &
Crutcher LLP

iii

*Monterey Mech. Co. v. Wilson*,
   125 F.3d 702 (9th Cir. 1997) ..................................................................... 19

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)..................................................................................... 19

*Nance v. Ward*,
   142 S. Ct. 2214 (2022) ............................................................................... 15

*Nguyen v. City of Buena Park*,
   No. 20-cv-348-JLS-ADS, 2020 WL 5991616 (C.D. Cal. Aug. 18, 2020)................. 6

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................................... 16

*RUI One Corp. v. City of Berkeley*,
   371 F.3d 1137 (9th Cir. 2004) ..................................................................... 12

*San Francisco Taxi Coal. v. City and Cnty. of San Francisco*,
   979 F.3d 1220 (9th Cir. 2020) ..................................................................... 11

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
   709 F.3d 1281 (9th Cir. 2013) ............................................................. 1, 4, 21

*Siebert v. Gene Security Network, Inc.*,
   75 F. Supp. 3d 1108 (N.D. Cal. 2014)......................................................... 18

*Silver v. Silver*,
   280 U.S. 117 (1929)....................................................................................... 6

*Southern Cal. Healthcare Sys., Inc. v. City of Culver City*,
   No. 21-cv-5052-MCS-RAO, 2021 WL 3160524 (C.D. Cal. July 23, 2021) ........... 6

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)..................................................................................... 20

*Tracy Bowes v. PennyMac Loan Servs., LLC*,
   No. 21-cv-2030-JLS-KES, 2021 WL 8944673 (C.D. Cal. Dec. 13, 2021)............... 4

*Ubiquity Press Inc. v. Baran*,
   No. 20-cv-1809-JLS-DFM, 2020 WL 8172983 (C.D. Cal. Dec. 10, 2020)............... 4

*Walgreen Co. v. City and Cnty. of San Francisco*,
   185 Cal. App. 4th 424 (2010) ..................................................................... 11

Gibson, Dunn &
Crutcher LLP

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*West Coast Hotel Co. v. Parrish*,
    300 U.S. 379 (1937)..................................................................................4

*Western Growers Ass'n v. City of Coachella*,
    548 F. Supp. 3d 948 (C.D. Cal. 2021)......................................................5

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..........................................................................3, 4, 17

*Ex parte Young*,
    209 U.S. 123 (1908).............................................................................16, 17

**CONSTITUTIONAL PROVISIONS**

Los Angeles Charter § 252 ...............................................................................14

Los Angeles Charter § 452 ...............................................................................14

Los Angeles Charter § 461 .................................................................................3

**STATUTES**

Los Angeles Municipal Code § 187.51 ........................................................7, 8, 14

Los Angeles Municipal Code § 187.57 ...............................................................16

Los Angeles Municipal Code § 188.07 ...............................................................14

Los Angeles Municipal Code § 188.08 ...............................................................14

**OTHER AUTHORITIES**

Chin et al., *Cal. Prac. Guide Employment Litigation* § 11:603.2 (Mar. 2022 update) ...6

*AltaMed Health Services Corporation Leads Healthcare Industry with a Living Wage
    Increase to a Minimum of $25 an Hour for Employees*, AltaMed (June 27, 2022),
    https://www.altamed.org/news/altamed-health-services-corporation-leads-
    healthcare-industry-living-wage-increase-minimum-25 ...........................................9

*New Report: California Hospitals Face Massive Financial Losses Due to COVID-19
    Pandemic; 2021 Shortfall Triple Previous Projections*, Cal. Hosp. Ass'n
    (Apr. 21, 2022),
    https://calhospital.org/new-report-california-hospitals-face-massive-financial-
    losses-due-to-covid-19-pandemic-2021-shortfall-triple-previous-projections/ .......11

Gibson, Dunn &
Crutcher LLP

# INTRODUCTION

The City fails to address the salient facts that matter to the provision of healthcare to Los Angeles residents.  It presents no evidence refuting that, without a short pause in the enforcement of Ordinance No. 187566 for this Court to examine its constitutionality, Plaintiff Barlow Respiratory Hospital, among others, expects it will no longer be able to care for some of the City's most vulnerable patients.  It presents no evidence contradicting that Gateways Hospital and Mental Health Center and Mission Community Hospital, along with countless other health facilities across the City, will be forced to materially cut their services to some of the City's most vulnerable populations. And critically, the City ignores the evidence presented that the Ordinance will wreak havoc on the healthcare industry in the City of Los Angeles, one of the most complicated and critically important sectors of our entire society.  Indeed, it treats the provision of healthcare—one of the most complicated businesses in the United States, where revenue largely comes from insurance or governmental sources—like a restaurant or hotel.  It is not.  ***In sum, the City has presented no evidence contradicting Plaintiffs' showing of irreparable harm, which was established through evidence concerning entities that will be impacted by the Ordinance and the patients of those entities.***

Instead, the City focuses nearly all of its attention on whether Plaintiffs will prevail on the merits.  But the City obscures both the relevant standard and the operative legal questions.  On the relevant standard, the City wholly forgets that Plaintiffs need show only "serious questions going to the merits," not a likelihood of success, because "the balance of hardships tips sharply" in favor of Plaintiffs.  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (emphasis omitted).  In any event, Plaintiffs have shown a likelihood of success on the *relevant* legal questions.

On the equal protection claims, the City wrongly frames the analysis as whether it would be rational to conclude that healthcare workers deserve a higher minimum wage.  We are all indebted to the healthcare workers who have helped us navigate this unprecedented pandemic.  But that is not the relevant legal inquiry.  The question before

the Court is whether there is a rational basis for why the Ordinance singles out *some*, but not all, healthcare facilities across the City and provides *some*, but not all, healthcare workers in the City a minimum wage of $25.  The City tries to defend this line-drawing by saying there is a rational distinction between public and private facilities.  But the Ordinance does not distinguish between public and private facilities.  The Ordinance distinguishes between *some* private facilities and *other* private facilities and public facilities.

The rest of the City's arguments about the relevant line-drawing that the Ordinance imposes are either factually incorrect or lacking any evidence at all.  For example, the City contends without any support that the Ordinance picks out the "most necessary and vulnerable [private] facilities."  Opp. at 14, Dkt. 26.  But the Ordinance made no such finding, and no evidence supports that the Ordinance's coverage definition captures "the most necessary and vulnerable" facilities.  Critically, the City fails to submit *any evidence* rebutting Plaintiffs' evidence that an asymmetrical minimum wage increase will *worsen* staffing shortages at facilities, such as federally qualified health clinics, that provide critical services to the most vulnerable patients in Los Angeles.  Unfortunately, the City has failed to adopt the "do no harm" principle that healthcare professionals live by.

The City also tries to change the inquiry on the due process claim in order to make its position appear stronger than it actually is.  The City strenuously argues that the opponents of the Ordinance had an adequate "opportunity to be heard" before its passage by the Los Angeles City Council, spilling much ink on that procedural history.  But that is not Plaintiffs' claim.  Plaintiffs contend that the Ordinance's timeline is blatantly unreasonable, and they will likely prevail on this claim and have at least raised serious questions about the timeline.  Thirty-one days' notice before the effective date is not adequate for even the nimblest healthcare provider to implement a 55% rise in the minimum wage, and it is certainly not enough time to gather the necessary "evidence of the actual or potential direct financial impact of compliance" and then receive a court

determination to obtain the one-year waiver purportedly offered to financially precarious facilities.  Here, too, the City has *no evidence* to the contrary.

The ultimate goal of a preliminary injunction is to preserve the status quo.  The City recognizes as much, but says the status quo might not be in danger because a referendary petition on the Ordinance is currently being circulated.  Plaintiffs will immediately alert the Court if the City Clerk certifies that the petition obtains the necessary number of signatures, which would moot the need for a preliminary injunction by pausing the law's effective date until the voters have an opportunity to weigh in.  Los Angeles Charter § 461(c).  But at this juncture, there is no certainty that the referendary petition will be successful.  That is why Plaintiffs seek a short pause in enforcement to make sure the Ordinance is constitutional before it wreaks havoc on the already fragile healthcare system in the City.  The Court should grant the request for a preliminary injunction and put this case on an expedited schedule to determine the constitutionality of the Ordinance.

## ARGUMENT

Plaintiffs' unrebutted evidence establishes each of the four factors that inform the Court's discretion to issue a preliminary injunction under *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  Plaintiffs have shown more than serious questions going to the merits.  They will suffer irreparable harm—the deprivation of constitutional rights, the risk of forced closure, and the loss of curtailed services—without an injunction.  And Plaintiffs' harm will be the public's harm too, as workers and patients suffer from facility closures and diminished services.  The Court should preserve the status quo to allow this case to move promptly to final judgment before the effects of the Ordinance become irreversible.

## I.   Plaintiffs Are Likely to Succeed on the Merits

The first *Winter* factor is whether Plaintiffs are "likely to succeed on the merits." 555 U.S. at 20.  This factor does not require an ironclad prediction at this early stage that Plaintiffs are more than 50% likely to prevail at final judgment.  *See All. for the Wild*

*Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).  Instead, Plaintiffs need show only that "there are serious questions going to the merits—a lesser showing than likelihood of success on the merits"—because "the balance of hardships tips sharply in [their] favor."  *Shell Offshore*, 709 F.3d at 1291 (cleaned up); *see* Argument Part III, *infra*.

The City never adequately addresses this factor because its Opposition entirely ignores the "serious questions" formulation for applying *Winter*.  *See* Opp. at 10–20.  But the City's failure to square up to this test cannot obscure that the sliding-scale approach governs in the Ninth Circuit.  *See, e.g.*, *Tracy Bowes v. PennyMac Loan Servs., LLC*, No. 21-cv-2030-JLS-KES, 2021 WL 8944673, at *3 (C.D. Cal. Dec. 13, 2021); *Ubiquity Press Inc. v. Baran*, No. 20-cv-1809-JLS-DFM, 2020 WL 8172983, at *3 (C.D. Cal. Dec. 10, 2020).  Plaintiffs *have* shown a likelihood of success, but at a bare minimum their claims present serious questions on the merits.

**A.    The Coverage Definition Violates the Equal Protection Clause.**

The Ordinance defies the constitutional "direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Rather than defend the choice to fragment healthcare facilities into two unequal camps, the City directs most of its attention to rebutting a claim that does not exist.  Its main defense of the Ordinance is that the City Council "rationally decided to compensate the brave healthcare workers who have routinely shown up and continue to work in the healthcare industry" during the ongoing pandemic.  Opp. at 12.  But Plaintiffs have never argued that minimum wage increases are themselves unconstitutional, or that the City Council could not have rationally decided to increase the minimum wage here.  *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 398–99 (1937).

Instead, Plaintiffs have brought a claim under the Equal Protection Clause because the Ordinance treats similarly situated facilities and their workers *unequally*.  The City has little to say in response to this improper singling out.  When it finally addresses

Plaintiffs' claim, it offers only a justification for one aspect of the coverage definition (the exclusion of public facilities) while ignoring the many nonsensical distinctions among private facilities.  Critically, the Ordinance does not divide covered and noncovered healthcare facilities along public and private lines, as the City insinuates. There are only four public facilities in the City of Los Angeles.  Miller Resp. Decl. ¶ 6. There are 1,288 non-covered *private* facilities.  *Id.* ¶ 5.  And there are 153 covered *private* facilities.  *Id.*  The Ordinance lacks a rational basis because the justifications given by the City to support the wage increase do not support—in fact, they contradict— the coverage definition.  Considering all possible rationales in turn, Plaintiffs are likely to carry their burden to "negate 'every conceivable basis' which might have supported the distinction[s]" drawn by the Ordinance.  *Angelotti Chiropractic v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015).

### 1.    The Coverage Definition Does Not Reward Healthcare Workers at Non-Covered Facilities.

Start with the City's justification of compensating healthcare workers who have sacrificed during the pandemic.  Opp. at 12–13.  Plaintiffs do not contest that this interest might provide a rational basis to increase the minimum wage for healthcare workers on an evenhanded basis.  *See, e.g.*, *Western Growers Ass'n v. City of Coachella*, 548 F. Supp. 3d 948, 961 (C.D. Cal. 2021).  But the interest in rewarding healthcare workers of course cannot justify the Ordinance's decision to exclude *more than half* (58%) of the healthcare workers in Los Angeles.  Mot. at 14, Dkt. 17; *see* Miller Decl. ¶ 9, Dkt. 17-7; Miller Resp. Decl. ¶ 5.  Even putting public healthcare workers to one side, the Ordinance still excludes more than half of healthcare workers (53%) at private facilities. Miller Resp. Decl. ¶ 5.  The City does not—and surely could not—say that workers at non-covered facilities are less deserving or worthy of recognition for their service during the pandemic.  So the Ordinance must rise or fall with the City's rationales for picking winners and losers among healthcare facilities and workers.

Gibson, Dunn & Crutcher LLP

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### 2.     The Coverage Definition Adopts an Upside-Down Approach.

To begin, the City cannot justify the coverage definition as a rational "step-by-step" approach.  Opp. at 2.  No one disputes that a legislator can focus on the subset of the problem most "deserving of special attention."  *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 965 (9th Cir. 2021); *see* Opp. at 13–14.  Rational laws often begin by "[t]argeting the biggest contributors" to a perceived social ill, *Angelotti*, 791 F.3d at 1086, or "the class of cases where it most frequently occurs," *Silver v. Silver*, 280 U.S. 117, 124 (1929).  But the Ordinance starts where low wages are *least* prevalent.  The City does not dispute that a greater proportion of workers at non-covered facilities (39%) earn less than $25 per hour as compared to covered facilities (28%).  Miller Resp. Decl. ¶ 7 (fixing percentage for covered facilities from Miller Decl. ¶ 9).

The Ordinance's decision to begin with an irrational subset makes this case like *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008), where the licensing law irrationally "single[d] out" pest controllers who posed less of a risk to "public welfare."  *Id.* at 991–92.  And that same irrational tailoring makes this case unlike *Southern California Healthcare System, Inc. v. City of Culver City*, No. 21-cv-5052-MCS-RAO, 2021 WL 3160524, at *6 (C.D. Cal. July 23, 2021), where a temporary "hero pay" increase was targeted to the city's "sole hospital that contains its only emergency room and intensive care unit," which made the hospital "uniquely suited to treat patients with acute COVID-19 symptoms."  *Id.* at *6; *see also, e.g.*, *Nguyen v. City of Buena Park*, No. 20-cv-348-JLS-ADS, 2020 WL 5991616, at *6 (C.D. Cal. Aug. 18, 2020) (rejecting claim that long-term rentals received unequal preference due to "the Council's judgment that short-term rentals uniquely impact the character of Buena Park neighborhoods").

### 3.     The Coverage Definition Contains Irrational Private-Private Distinctions.

The City's principal and unsupported justification for the coverage definition is that "the City cannot set rates for federal, state and county workers."  Opp. at 14.  As an initial matter, that does not appear to be settled.  *See* Chin et al., *Cal. Prac. Guide*

*Employment Litigation* § 11:603.2 (Mar. 2022 update). Nor can a desire not to "increase taxes" explain the coverage definition. Opp. at 14. The City seems to imply that private facilities have private streams of income, while public facilities draw on the public fisc. But nothing could be further from the truth. Many private facilities predominantly rely on government funds to provide their services. Mohan Decl. ¶ 7, Dkt. 17-1; West Decl. ¶ 5, Dkt. 17-2; Klein Decl. ¶ 5, Dkt. 17-3. While Medicare and Medi-Cal reimbursement increases will come too late for covered facilities on the edge of financial disaster, increased labor costs will eventually lead to increased demands on these government-funded programs, which of course depend on taxes. Miller Decl. ¶ 25. The City also asserts that public hospitals pay more than private hospitals, but its lone supporting example relies on misleading cherry-picking of statistics and jobs. Ziombra Decl. ¶¶ 4–6.

But all of the City's justifications for excluding the handful of public facilities are window dressing because the Ordinance does not adopt a public-private distinction. At several points, the City misstates the scope of the Ordinance as targeting "the private sector" or "apply[ing] to private rather than public entities." Opp. at 2. That framing ignores almost the entire Ordinance. It is true, of course, that the coverage definition starts by excluding all public hospitals, of which there are only four in Los Angeles. Los Angeles Municipal Code § 187.51(B). But the Ordinance proceeds to draw numerous distinctions among the thousand-plus *private* facilities:

- It covers private general acute care hospitals and private acute psychiatric hospitals, but *not* other in-patient facilities such as intermediate care facilities and residential facilities. *Id.* § 187.51(B)(1), (3); *see* Miller Resp. Decl. ¶ 5.

- It covers private clinics that are "conducted, operated, or maintained as an outpatient department of a general acute care hospital or acute psychiatric hospital," but *not* any other private clinics (which make up the vast majority of clinics in Los Angeles). Los Angeles Municipal Code § 187.51(B)(2); *see* Miller Resp. Decl. ¶ 5.

- It covers private skilled nursing facilities that are "part of a general acute care hospital or acute psychiatric hospital," but *not* any other private skilled nursing facilities.  Los Angeles Municipal Code § 187.51(B)(4).

- It covers private residential care facilities if they share an address or "campus or parcel of real property" with an acute psychiatric hospital, but *not* any other private one.  *Id.* § 187.51(B)(5).

- It covers *all* dialysis clinics, whether or not affiliated with a hospital, and whether or not they share land with a hospital.  *Id.* § 187.51(B)(6).

- It covers *all* facilities that are part of an "Integrated Healthcare Delivery System," defined by reference to common ownership, trade name, or contractual relationship with an affiliated hospital.  *Id.* § 187.51(B)(7), (H).

The City never puts forth a justification for this line-drawing.  *See* Opp. at 14–15 (hypothesizing only reasons to exclude public facilities).  The City does not explain why workers at a burn unit affiliated with a covered hospital deserve a raise, while workers performing the same job at a burn unit do not if the clinic is not affiliated with a covered hospital.  It does not argue that staffing shortages are worse, or that retention problems are greater, for covered facilities than for non-covered facilities.  And it does not argue that covered facilities are more capable of absorbing the cost increase than non-covered facilities.  Nor could it, given the unrebutted evidence submitted by Plaintiffs that many covered facilities, including Barlow and Gateways, are already on the brink of financial ruin.  *See* Mohan Decl. ¶ 6; Wong Decl. ¶ 6, Dkt. 17-5.  On this record, then, non-covered facilities are similarly situated "in all *relevant* respects" to covered facilities.  *Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021) (emphasis added).

Plaintiffs are likely to prevail because, whatever nominal differences might exist among private facilities, the Ordinance "has no reasonable relation to these differences."  *Hartford Steam Boiler Inspection & Ins. Co. v. Harrison*, 301 U.S. 459, 463 (1937).  The Ordinance grants non-covered clinics with thousands of employees years to decide the best way to adjust wages up to $25 per hour, while covered facilities such as Barlow are

blindsided with an immediate 55% increase in the minimum wage. For example, AltaMed (which operates non-covered clinics in Los Angeles) recently announced that it "will reach its goal of providing a minimum $25 per hour living wage to its employees"—not in August 2022, but in *2025*. *AltaMed Health Services Corporation Leads Healthcare Industry with a Living Wage Increase to a Minimum of $25 an Hour for Employees*, AltaMed (June 27, 2022), https://www.altamed.org/news/altamed-health-services-corporation-leads-healthcare-industry-living-wage-increase-minimum-25. This disparate treatment, simply put, makes no sense.

The most glaring example of irrationality might be that dialysis clinics were apparently included as retaliation for the initiative proponent's failed attempts to unionize their employees. Mot. at 15–16. The City is unwilling to even venture an explanation for this disparate treatment. *See generally* Opp. at 1–25. That's because there is none: the retaliatory coverage definition violates *Fowler Packing Co. v. Lanier*, 844 F.3d 809 (9th Cir. 2016), by including dialysis clinics for no reason "other than to respond to the demands of a political constituent." *Id.* at 815.

### 4. The Coverage Definition Exacerbates Turnover at Non-Covered Facilities.

Plaintiffs previously submitted evidence showing that the Ordinance will increase the overall amount of turnover at healthcare facilities. Mot. at 16–17. Many struggling non-covered facilities will not be able to raise wages. Miller Decl. ¶ 20. And some of their workers may leave for covered facilities. *Id.* ¶¶ 15–17; *see* Miller Resp. Decl. ¶ 15. This dynamic works to force facilities to decrease their services to patients. Miller Decl. ¶¶ 19–20.

The City does not offer any evidence to rebut Dr. Miller's testimony. Its Opposition claims only that Plaintiffs have "contradict[ed] themselves" by saying, on one hand, that workers will continue to leave the healthcare industry for reasons unrelated to compensation and, on the other, that workers who remain in healthcare will consider leaving non-covered facilities for covered facilities to get a raise. Opp. at 16.

That is perfectly consistent:  some workers will leave the healthcare industry altogether for other reasons despite the increase in wages, and workers at non-covered facilities will have a good reason to jump to a covered facility to take that place.  Miller Resp. ¶¶ 15–16.  An evenhanded minimum wage increase would not create this problem, but an asymmetrical wage increases (rather than decreases) workforce volatility.

Not only does the City have no evidence itself, but it also has an astonishing reaction to the evidence that the Ordinance will exacerbate staffing shortages at non-covered facilities.  Citing nothing, the City suggests that the Court can just look the other way about such shortages at non-covered facilities because covered private facilities are "the most necessary and vulnerable facilities."  Opp. at 14.  This throwaway statement demeans the indispensable role of non-covered facilities in the lives of Angelenos.  Here are just a few of the types of non-covered facilities that, according to the City, are less "necessary and vulnerable": "community health clinics, federally qualified healthcare clinics ('FQHC'), ambulatory surgical centers, or family planning clinics."  Miller Decl. ¶ 4; *see also* Miller Resp. Decl. ¶ 5.

How can the City state with a straight face that a family planning clinic, at this particular moment, is not a necessary and potentially vulnerable facility?  While a rational decisionmaker perhaps could have discounted the risk of a staffing shortage at the plastic surgery "celebrity clinic" (even though that makes no economic sense since the celebrity clinic would be well positioned to afford the increased wages), Opp. at 14, many non-covered private facilities are at the forefront of the most critical care in Los Angeles—from the local clinic providing immunizations and care for COVID-19 to reproductive healthcare, *see* Miller Decl. ¶ 19.  The Ordinance draws lines that exacerbate staffing shortages at non-covered facilities and in turn disrupts the delivery of essential healthcare to Angelenos.  *See id.* ¶ 18 (discussing grave concerns about FQHCs).

Again, this case is like *Merrifield*.  The interest in compensating workers cannot justify excluding workers at non-covered facilities.  *See supra*, at 6.  Nor can the interest

in combating staffing shortages justify an asymmetric coverage definition that will predictably exacerbate workforce retention at non-covered facilities.  Either way, the City has put forward a "completely contradictory rationale"—a justification to *impose* an increase on covered facilities that runs counter to its decision to *exempt* non-covered facilities.  *Merrifield*, 547 F.3d at 991.

The City's only response to *Merrifield* is that the case "presented a unique set of facts."  *Am. Soc'y of Journalists*, 15 F.4th at 965.  To be sure, this case does not involve pesticides or squirrels.  *See* Opp. at 15.  But the Equal Protection Clause's guarantee of rational treatment of similarly situated parties is no less important for healthcare facilities than for pest controllers.  As the City elsewhere notes, "*Merrifield* stands for the unremarkable proposition that no rational basis exists if the law lacks *any* legitimate reason for its adoption."  *San Francisco Taxi Coal. v. City and Cnty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020).  Plaintiffs have made that preliminary showing at this stage and ask for a short-term injunction to preserve the status quo and allow them to make their full case on the merits.

### 5.  The Coverage Definition Does Not Track Profits.

Plaintiffs already demonstrated that no "reasonably conceivable facts" about healthcare facility profits could justify the coverage definition.  *Walgreen Co. v. City and Cnty. of San Francisco*, 185 Cal. App. 4th 424, 442 (2010).  In fact, "California hospitals collectively have lost more than $20 billion since the beginning of the pandemic."  *New Report: California Hospitals Face Massive Financial Losses Due to COVID-19 Pandemic; 2021 Shortfall Triple Previous Projections*, Cal. Hosp. Ass'n (Apr. 21, 2022), https://calhospital.org/new-report-california-hospitals-face-massive-financial-losses-due-to-covid-19-pandemic-2021-shortfall-triple-previous-projections/.  This is not just, as the City glibly states, "the lack of increasing profits."  Opp. at 16.  These are, in fact, "massive financial losses."

Small wonder, then, that the City mounts no serious attempt to defend the coverage definition based on profits.  Nor could it.  The coverage definition does not

attempt to draw a line based on a facility's profits or even on its for-profit status.  Private facilities can be for-profit or not-for-profit, but the Ordinance takes no heed of this line.  The Ordinance includes all private general acute care and psychiatric facilities, no matter how much they have struggled during the pandemic.  And the Ordinance excludes all clinics not affiliated with such hospitals—so long as the clinic does not offer dialysis services—no matter how profitable the business might be.  The coverage definition's total indifference to financial condition will likely press many facilities to the brink of cutting services and others over the edge into closing.  *See* Mohan Decl. ¶¶ 7–8; *compare Cal. Grocers Ass'n v. City of Long Beach*, 521 F. Supp. 3d 902, 915 (C.D. Cal. 2021) (upholding temporary "hero pay" measure for grocery workers based on evidence that sales had grown by double digits during the pandemic at time of enactment).  In fact, 28% of covered facilities were already operating at a deficit, and 8% more will join them if the Ordinance goes into effect.  Miller Decl. ¶ 30; Miller Resp. Decl. ¶ 9.

The City thus abandons facility profits in favor of "personal profits" (*i.e.*, executive compensation), listing the salaries of three of the declarants.  Opp. at 17.  But notice what the City does not say:  the City never contends that the coverage definition does (or is even meant to) rationally mirror levels of executive compensation at covered facilities as compared to non-covered facilities.  The Court should see the City's new makeweight excuse for what it is—an attempt to publicly shame declarants who spoke out about the harmful and unconstitutional effect of the Ordinance on their facilities' ability to provide services to needy patients.

### 6. The Coverage Definition Does Not Increase Wages in Exchange for Public Benefit.

The City never contends that the Ordinance increases the minimum wage at covered facilities in exchange for a public benefit.  So despite the City's repeated citation of cases like *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137 (9th Cir. 2004), those cases lend the Ordinance no support.  *See id.* at 1156; *see also* Mot. at 18–19.

**B.** **The Ordinance Deprives Plaintiffs of Procedural Due Process.**

The Opposition's failure to grapple adequately with procedural due process streamlines these claims for the Court's consideration.  First, the City never contests that the enforcement of the Ordinance deprives Plaintiffs of property interests protected by the U.S. and California Constitutions, or that a waiver is a statutory right protected by the California Constitution.  Mot. at 20.  And second, the City never addresses "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  The City's only defense appears to be that the Ordinance's procedures do not create a "risk of an erroneous deprivation" of property or statutory interests, *id.*, because Plaintiffs had notice of the proposed initiative and could get an effective waiver within 31 days, Opp. at 18–20.  The City is wrong on both counts.

**1.**     **The Implementation Period Deprives Plaintiffs of a Reasonable Opportunity to Comply with the Ordinance.**

The Ordinance's implementation period violates the Due Process Clause because it authorizes enforcement before Plaintiffs have a "reasonable opportunity" to comply with the law.  *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000).  Consider, for example, a law that required the purchase of a new type of insurance (say, renter's insurance) in addition to auto insurance.  Even if compelling the purchase of this insurance were permissible, the Ordinance would be inconsistent with due process if the government could start punishing uninsured individuals *the next day*.  There is a high "risk of an erroneous deprivation" that such a law would punish the past (lawful) conduct of not having such insurance, rather than the present decision not to comply with the law.  *Mathews*, 424 U.S. at 335.

This claim works in much the same way.  Even the most diligent healthcare facility would struggle to make sense of the confusing and vague worker categories covered by the Ordinance—such as who is a "professional" or who is a "non-professional" (and who, one wonders, is neither).  Los Angeles Municipal Code

§ 187.51(G).  After navigating the poorly drafted Ordinance, covered facilities must face the daunting task of corralling the funds to increase wages given that the government sets (and private payers negotiate) reimbursement rates well in advance.  Miller Decl. ¶ 26.  All this in 31 days, and all this on pain of severe monetary penalties if a facility cannot run the gauntlet.  Los Angeles Municipal Code §§ 188.07(B), 188.08(A).

The City misunderstands the claim about the effective date.  It places almost exclusive reliance on *Halverson v. Skagit County*, 42 F.3d 1257 (9th Cir. 1994), which applies when a claim "does not deal with the substance of the challenged decisions, but with the process by which they were reached."  *Id.* at 1260.  Plaintiffs do not argue, however, that the Constitution guarantees any particular right to be heard before the City Council adopts a ballot proposal as an ordinance.  *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).  In fact, some of the Plaintiffs voiced their objections at that time.  *See* Mot. at 5.  But their due process claims target the Ordinance's procedure for compliance—not the City Council's willingness to entertain public participation.

In spending its time knocking down a straw man, the City is left with a flimsy response to Plaintiffs' actual claim:  The 31-day implementation period is a constitutionally inadequate procedure because covered facilities do not have enough time to overcome the legal and practical hurdles to compliance before they face potentially crippling enforcement actions.  Mot. at 21.  In *Goldberg v. Kelly*, 397 U.S. 254 (1970), for example, the Supreme Court invalidated a seven-day notice period under a state regulation period as inadequate to give a welfare recipient "an effective opportunity to defend" himself before an enforcement proceeding.  *Id.* at 267–68.  Plaintiffs raise a similar claim here.

The City's principal justification for the inadequate compliance period is that the City Council could not alter the provisions (including the effective date) under the City Charter.  *See* Opp. at 18 (citing Los Angeles Charter §§ 252, 452(b)(1)).  The rigidity of the process for transforming ballot initiatives into ordinances is of course not an excuse

1   for enacting a provision that denies Plaintiffs their right to procedural due process.  In

2   other words, there is no "just following state law" defense to a federal constitutional

3   violation.  *See Nance v. Ward*, 142 S. Ct. 2214, 2223–24 (2022) ("One of the 'main

4   aims' of § 1983 is to 'override'—and thus compel change of—state laws when necessary

5   to vindicate federal constitutional rights.").

6          The City's other justification is that the initiative proponent filed a petition in

7   February, almost six months before the Ordinance takes effect.  Opp. at 18.  But

8   Plaintiffs could not have known then that the initiative would qualify for the ballot in

9   June, much less if the voters would approve the initiative in November, and much less

10  still that the City Council would immediately enact the ballot initiative in June (against

11  the recommendation of the City Clerk).  *See* Mot. at 5.  Tellingly, the City cites no

12  authority for the proposition that parties must *presume* that a bill or initiative will

13  become law and spend valuable resources planning for that contingency.  The welfare

14  recipient in *Goldberg* could have known beforehand that state regulations might give

15  him only seven days to prepare his defense against a termination of benefits, but that did

16  not mean that the Due Process Clause required him to plan ahead for every possibility.

17  Neither does the Constitution require Plaintiffs to prophesize the vagaries of the ballot

18  initiative process.  (For that matter, the Court likewise need not engage in such

19  predictions, as the City suggests, as to the referendary petition.  *See infra*, at 20–21.)

20               **2.     The Waiver Process Is Illusory.**

21         The Ordinance purports to create a right to a waiver in light of the risk that a 55%

22  increase in the minimum wage could force covered facilities—already in a weakened

23  state from weathering the pandemic—to go under.  But even though the effective date

24  puts covered facilities in a bind, its waiver process offers them no way out.  The

25  procedures demand detailed accounting predictions and opt for a judicial forum that,

26  when combined, eliminate the possibility that any facility could get a waiver by August

27  13.  No facility—not one—that is entitled to a waiver can get one before the increase

28  goes into effect.  *See* Mot. at 21–22.

The City has no legitimate interest in depriving financially unstable facilities of a waiver, as the City concedes: "[i]t is not in the City's, or anyone's, interest for a covered healthcare facility or physician's group to close." Opp. at 19. So the only question is whether the Ordinance provides adequate procedures to get a waiver before August 13.

Again, 31 days simply is not enough time for Plaintiffs to (1) gather "evidence of the actual or potential direct financial impact of compliance" and (2) receive a determination from a court before the Ordinance takes effect. Los Angeles Municipal Code § 187.57. The City argues that Plaintiffs already have the necessary evidence in their possession because they file quarterly and annual financial reports with the State. Opp. at 20. But that's just wrong: Those financial reports concern past performance. They do not address the forward-looking analysis of whether the facility can afford the increased wages required by the Ordinance and remain "a going concern under generally accepted accounting reports." Los Angeles Municipal Code § 187.57. This sort of complex bankruptcy analysis requires time that the Ordinance fails to provide. *See* Miller Decl. ¶¶ 34–36; Greene Decl. ¶ 10, Dkt. 17-4.

If Plaintiffs cannot acquire this evidence in time (as the record demonstrates in spades), the City suggests they "seek appropriate relief including a stay to do so." Opp. at 19. What the City must mean by a "stay" is an injunction because there is no court or administrative decision to stay. *See Nken v. Holder*, 556 U.S. 418, 428 (2009). And that is exactly what Plaintiffs request. Only an injunction against enforcement can protect Plaintiffs' constitutional rights because they cannot be "expected to disobey any of the provisions of the [Ordinance] at the risk of such fines and penalties being imposed upon them, in case the court should decide that the law was valid." *Ex parte Young*, 209 U.S. 123, 146 (1908). As the City itself recognizes, Plaintiffs should receive "appropriate relief" (*i.e.*, a preliminary injunction) to allow them "time to gather [their] documentation." Opp. at 19.

The City also attacks Plaintiffs' standing to bring this claim because they have not sought a waiver through the Ordinance's procedures. Opp. at 19. It's not even clear

what those procedures are, as the City effectively concedes by never even attempting to explain what they would entail. *See id.* at 20 n.3. This vagueness is a vice, not a virtue, given the Ordinance's expedited 31-day timeline. In any event, Plaintiffs need not submit to an unconstitutional waiver process to have standing to challenge it. Article III requires only that Plaintiffs be "able and ready" to use a substitute constitutional procedure. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *see also Carney v. Adams*, 141 S. Ct. 493, 500 (2020). Plaintiffs have more than shown that they are able, ready, and willing to make use of an adequate waiver process. Mohan Decl. ¶ 9; West Decl. ¶ 10; Klein Decl. ¶ 11; Wong Decl. ¶ 11; Theiring Decl. ¶ 9, Dkt. 17-6. The City's lone case, *Clark v. City of Seattle*, 899 F.3d 802 (9th Cir. 2018), held only that a claim was unripe because the law did not penalize the plaintiffs' conduct and the plaintiffs in any event were not engaged in "proscribed conduct." *Id.* at 812–13. But as just explained, it is undisputed that Plaintiffs face looming penalties for conduct that will soon be proscribed by the Ordinance. *See Young*, 209 U.S. at 146.

## II.   Plaintiffs Have Shown Likely Irreparable Harm from the Unconstitutional Ordinance

Plaintiffs have also shown a likelihood of "irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The *only* evidence before the Court is that critical components of healthcare in Los Angeles are likely to be unavailable after August 13 absent a preliminary injunction. The City does not present any evidence that refutes that Plaintiff Barlow, and others like it, are already operating in the red and risk closing their doors to both their workers and their patients. *See* Mohan Decl. ¶¶ 6–7; Miller Decl. ¶¶ 27–28. Similarly, the City does not have any evidence that calls into doubt that Gateways and Mission Community fear they may be forced to dramatically reduce services, thereby harming those most vulnerable, including children involuntarily hospitalized for acute mental health conditions. Wong Decl. ¶¶ 2–3, 7; Theiring Decl. ¶¶ 3, 7. And the City does not (and cannot) dispute that "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v.*

1  *Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).  So the City instead relies

2  on frivolous objections, erroneously quibbles at the margins about the persuasiveness of

3  the declarations, misstates the law on constitutional violations, ignores key evidence,

4  and predicts the motion could become moot.  None of these sideshows can distract from

5  the unmistakable truth:  this Ordinance is a bull in a china shop.  Before it is let loose, it

6  behooves everyone to ensure it is constitutional.

7       *First*, the City contends that the Chief Executive Officers of Barlow, Gateways,

8  and the Hospital Association of Southern California lack "foundation" and are

9  "speculat[ing]" about what will happen if the Ordinance goes into effect—that they and

10  their members will likely be forced to close or reduce services.  But who would be better

11  positioned to make such a statement than the CEOs running those very hospitals and the

12  CEO of the organization that represents hospitals in Los Angeles County?  Of course an

13  "officer of a business" can testify about "the value or projected profits of the business."

14  *Siebert v. Gene Security Network, Inc.*, 75 F. Supp. 3d 1108, 1113–14 (N.D. Cal. 2014);

15  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1174–75 (3d Cir. 1993) (similar).

16  Plaintiffs' declarations are admissible even under the strictest evidentiary standards and

17  far exceed the threshold in the context of a preliminary injunction where "the rules of

18  evidence do not apply strictly."  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736

19  F.3d 1239, 1250 n.5 (9th Cir. 2013).  In response, the City introduces no evidence, even

20  though irreparable harm depends on "factual findings" that rest on "support in the

21  record."  *Arc of California v. Douglas*, 757 F.3d 975, 984 (9th Cir. 2014).

22       *Second*, there is no basis for questioning the veracity and persuasiveness of the

23  declarations.  The City argues that Mr. Mohan's predictions that Barlow will have to

24  close is "speculative" because (1) he doesn't specify how many of its 380 employees are

25  in the City of Los Angeles and paid less than $25, and (2) the percentage of its labor

26  costs is 42.6% based on data from 2021.  None of this matters:  the number of employees

27  and the percentage of labor costs doesn't change the irrefutable fact that the CEO

28  believes he will need to close at least one location, and possibly all three.  But the City's

methodology is not only silly, but plain wrong.  The City relies on outdated data from 2021, whereas Mr. Mohan used the most current data available.  Mohan Resp. Decl. ¶ 7. And in any event, Mr. Mohan has supplied the information the City claims is missing. *Id.* ¶¶ 4–10.  The City's criticisms only highlight the weaknesses of its arguments and the striking lack of *any* evidence refuting Plaintiffs' showing of irreparable harm.

*Third*, the City argues that a constitutional violation suffices to show irreparable harm only for "different types of alleged violations, such as violations of the First Amendment, a prisoner's Eighth Amendment right to adequate medical care, or the right to vote."  Opp. at 21.  But this is just wrong.  The City conveniently ignores that in *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997), the Ninth Circuit held that a violation of the Equal Protection Clause—the very claim at issue here—"'will often alone constitute irreparable harm.'"  *Id.* at 715 (citation omitted).  That is why Plaintiffs quoted and expressly relied on *Monterey Mechanical* in their motion.  *See* Mot. at 23.  Yet the City just skips over that binding precedent.  The Court should not. Regardless, a "constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm" because Plaintiffs would otherwise be forced to choose between their constitutional rights and exposure to massive financial liability.  *Am. Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058–59 (9th Cir. 2009); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

*Fourth*, the City tries to turn the irrationality of the coverage definition into an advantage on irreparable harm.  Accepting that covered facilities are less likely to pay wages below $25 per hour than non-covered facilities, *see supra*, at 6, the City argues that the financial impact on covered medical facilities will therefore be limited.  Opp. at 23.  Not so.  The Ordinance will impose annual costs of $370 million on covered facilities, increasing total salary costs by 7% and pushing some facilities, such as Barlow, into financially unsustainable territory.  Miller Resp. Decl. ¶¶ 7–8.

*Fifth*, the City contends that Plaintiffs will not suffer irreparable harm because "Plaintiffs cite no law preventing them from lowering wages" if it is determined the

Ordinance is unconstitutional.  Opp. at 24.  But that's beside the point.  The record contains unrebutted evidence that as a *practical* matter it "will be counterproductive, if not impossible, to reduce the wages" of employees because that "would only destabilize the workforce, damage the employer-employee relationship, cause staffing shortages, and, as a result, harm patient care."  Greene Decl. ¶ 3; *accord* Miller Decl. ¶ 44; *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (recognizing harm based on "predictable effect" of government action on individual decisions).  This economic harm is irreparable because, as the City does not deny, Plaintiffs "will not be able to recover monetary damages" caused by the stickiness of the new wage floor.  *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

*Finally*, the City makes the remarkable argument that the Court should find no irreparable harm and deny the preliminary injunction because the motion "*may* be moot" "*if*" enough signatures are collected in support of a referendary petition that would stay enforcement of the Ordinance to allow the people of Los Angeles to weigh in first.  Opp. at 21 (emphasis added).  Not surprisingly, the City has no support for this argument. That's because the mere possibility that a dispute *might* become moot does not make the motion moot.  And it does not take away the *current* threat that the City could begin enforcing the Ordinance on August 13.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016). The City's position is akin to saying that a preliminary injunction is not necessary to stop a wrecking ball from destroying a historical home because there *could* be a change of heart by the developer or the wrecking ball *might* have a mechanical failure.  Of course, if the City Clerk certifies a successful referendary petition, before or after this Court's decision on this motion, Plaintiffs will promptly notify the Court.

\*     \*     \*

The record demonstrates unequivocally that without a short pause, the Ordinance will cause irreparable harm to Barlow, Gateways, Mission Community Hospital, and countless other critical providers of healthcare and their patients, many of whom are

among the most vulnerable members of our city.  The Court should maintain the status quo for just a few months to allow for a considered judgment on the Ordinance's constitutionality.

## III.    The Balance of Equities and Public Interest Sharply Favor a Preliminary Injunction

Plaintiffs have explained that "the balance of the equities favor preventing the violation of a party's constitutional rights," *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017), and that "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  *See* Mot. at 24–25.  If Plaintiffs' claims raise "serious questions," then injunctive relief is appropriate because "the balance of hardships tips sharply" toward Plaintiffs.  *Shell Offshore*, 709 F.3d at 1291 (cleaned up).  The City hardly pushes back, arguing only that Plaintiffs "have not established a likelihood of success" (again, overlooking the serious-questions standard).  Opp. at 24.  But Plaintiffs have done so. *See* Argument Part I, *supra*.

The main countervailing consideration raised by the City is that some healthcare workers have been struggling to make ends meet.  Opp. at 24–25.  This is an important consideration.  It might even be an overriding consideration if Plaintiffs had claimed that no minimum wage increase was permissible at all.  But this financial distress only underscores the City's irrational choice to leave more than half of identically situated healthcare workers out in the cold, and in so doing depriving Plaintiffs of equal protection under the law.  And it provides more, not less, reason for caution before letting the law go into effect with an inadequate waiver process.  No one benefits—not the City, nor workers, nor patients, nor the public at large—if facilities are expected to close as a result of the unconstitutional Ordinance.  *See, e.g.*, Mohan Decl. ¶ 11; Mohan Resp. Decl. ¶¶ 12–14.

The City's reliance on *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), further undermines its position.  There, the Ninth Circuit observed that "the

prospect of closing down a business is a serious hardship." *Id.* at 1092.  The balance of equities did not favor injunctive relief only because that "closure was very likely, if not certain," for reasons *other* than the challenged government action, which made the plaintiff "largely responsible for [its] own harm." *Id.* at 1092–93 (cleaned up).  Here, however, the unrebutted evidence is that Barlow's closure will be caused by the Ordinance and could even be staved off by the one-year waiver.  Mohan Decl. ¶¶ 7, 9.  And Barlow is not alone.  *See* Greene Decl. ¶ 7.

In the end, the City seeks to change the status quo in drastic and immediate fashion.  Plaintiffs ask for nothing more for a short reprieve as this case proceeds quickly to final judgment.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin Defendants from enforcing or causing to be enforced the Ordinance against them or their members, pending final judgment.

Gibson, Dunn &
Crutcher LLP

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1   Dated: July 29, 2022                    Respectfully submitted,

2

3                                           GIBSON, DUNN & CRUTCHER LLP

4

5                                           By:        */s/ Maurice Suh*
                                                          Maurice Suh
6

7

8                                           Attorneys for Plaintiff California Hospital
                                            Association
9

10                                          BELL, MCANDREWS & HILTACHK, LLP

11

12                                          By:        */s/ Thomas W. Hiltachk*
                                                          Thomas W. Hiltachk
13

14

15                                          Attorneys for Plaintiffs Barlow Respiratory
                                            Hospital; PIH Health Good Samaritan Hospital;
                                            Providence Holy Cross Medical Center;
16                                          Hospital Association of Southern California

17

18

19

20

21

22

23

24

25

26

27

28

**<u>ECF ATTESTATION</u>**

I, Maurice Suh, hereby attest pursuant to Local Rule 5-4.3.4(a)(2) that the concurrence in the filing of this document has been obtained by the above signatories.

Dated: July 29, 2022

*/s/ Maurice Suh*
Maurice Suh

Gibson, Dunn &
Crutcher LLP

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION